# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re

OTERO COUNTY HOSPITAL
ASSOCIATION, INC. (d/b/a Gerald            No. 11-11-13686-_____A
Champion Regional Medical Center),

               Debtor.

---

## DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING DEBTOR TO (A) MAINTAIN INSURANCE PROGRAMS, (B) MAINTAIN INSURANCE PREMIUM FINANCING PROGRAMS, (C) PAY INSURANCE PREMIUMS IN THE ORDINARY COURSE AND (D) PAY ALL OBLIGATIONS ASSOCIATED THEREWITH; AND (II) PREVENTING INSURANCE COMPANIES FROM GIVING ANY NOTICE OF TERMINATION OR OTHERWISE MODIFYING ANY INSURANCE POLICY WITHOUT <u>OBTAINING RELIEF FROM THE AUTOMATIC STAY</u>

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Otero County Hospital Association, Inc. d/b/a Gerald Champion Regional Medical Center ("<u>GCRMC</u>," or, the "<u>Debtor</u>"), pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United State Code (the "<u>Bankruptcy Code</u>") and the UST Guidelines (defined below), hereby files its *Emergency Motion for Entry of an Order (i) Authorizing Debtor to (a) Maintain Insurance Programs, (b) Maintain Insurance Premium Financing Programs, (c) Pay Insurance Premiums in the Ordinary Course, and (d) Pay all Obligations Associated therewith; and (ii) Preventing Insurance Companies from Giving any Notice of Termination or Otherwise Modifying any Insurance Policy without Obtaining Relief from the Automatic Stay* (the "<u>Motion</u>").  In support of the Motion, the Debtor submits the *Affidavit of William Morgan Hay in Support of First Day Motions and Applications* (the "<u>Hay Affidavit</u>"),[1] filed contemporaneously herewith and incorporated by reference herein, and respectfully represents:

---

[1]     Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Hay Affidavit.

# I.

# BACKGROUND

## A.    General Background

1.      On the date hereof (the "Petition Date"), the Debtor filed with this Court a voluntary petition (the "Petition") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy case (the "Bankruptcy Case" or the "Chapter 11 Case").  The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' committee has yet been appointed in this case by the Office of the United States Trustee, nor has any trustee or examiner been requested or appointed.

### i.      GCRMC's Business

2.      GCRMC is a New Mexico non-profit corporation qualified to do business pursuant to section 501(c)(3) of the United States Internal Revenue Code as a public charity.  Its mission is to provide healthcare services and education to the greater-Otero County community.  In fulfilling its mission statement, GCRMC serves a total population of approximately 70,000 people.  Since 1949, GCRMC has provided quality medical care regardless of race, creed, sex, national origin, disability, age, or financial means.  Although payment for services rendered is critical to its operation, GCRMC believes that all individuals should have access to comprehensive, first-class medical services and healthcare education.

### ii.     The Hospital

3.      In accordance with its mission statement, GCRMC developed and operates the Gerald Champion Regional Medical Center (the "Hospital") in Alamogordo, New Mexico.  The Hospital, built in 1999, replaced GCRMC's then-existing facilities, which had been in use since 1949.  The Hospital is the only acute care healthcare facility in Otero County and is over

seventy-five miles driving distance from the closest comparable facility.  The Hospital features, among other things, diagnostic imaging services (i.e., MRI, CAT scan, and nuclear medicine), cardiopulmonary services, gero-psych services, inpatient rehabilitation services, an intensive care unit, a maternal child unit, and sleep disorder study capabilities.  It is also designated as a Level III trauma center.  When the new facility opened in 1999, the Hospital received design awards and was recognized as a state-of-the-art community medical facility.

4.      In order to continue to provide first-class medical services, GCRMC is currently in the process of making major improvements to the Hospital, including converting the majority[2] of its double patient rooms to single patient rooms to improve infection control, ease of HIPAA compliance, and the overall patient experience.  In total, the Hospital currently has ninety-nine licensed acute care beds, twelve gero-psychiatric beds, and twelve inpatient rehab beds.

5.      A significant volume of patients make use of the Hospital's facilities each year. On an average annual basis, the Hospital has approximately 4,400 admissions and 32,000 emergency room visits.  Annually, it is also the site of approximately 600 infant deliveries, 2,100 in-patient surgical procedures and over 7,000 out-patient procedures.  In accordance with its mission to provide healthcare to the entire community, GCRMC provides services through the Hospital to patients covered by limited reimbursement insurers such as Medicaid and the County Indigent Program.  Many uninsured and underinsured patients are covered by GCRMC's charity care policy.  Over the past three years, the average unreimbursed value of charity care provided was approximately $2.2 million per year.

6.      In connection with the development of the new facility in 1999, GCRMC entered into a sharing agreement with the Department of Defense whereby Air Force physicians from

---

[2]      Once this transition is complete, only the gero-psych rooms will remain double patient rooms to facilitate patient socialization.

nearby-Holloman Air Force Base are credentialed to admit and treat Department of Defense beneficiaries. The Hospital was among the first civilian healthcare facilities that permitted active duty physicians to practice medicine in a non-Department of Defense facility. This initiative has saved the Department of Defense nearly $5 million annually in operational costs and millions more in Military construction costs.

7.     The Hospital's sizeable staff makes GCRMC Otero County's largest non-governmental employer. GCRMC relies upon a workforce of approximately 704 employees, including approximately 562 full time employees and 142 part time or as-needed employees. On an annualized basis, GCRMC pays approximately $37.7 million in wages and salaries to its employees and an additional approximately $8.6 million in benefits.

**iii.     GCRMC's Commitment to Community Healthcare Beyond its Doors**

8.     GCRMC's efforts to meet the healthcare needs of its community go well beyond the direct provision of care at the Hospital. In addition to those core healthcare services, GCRMC provides many free or below-cost services throughout the year that GCRMC believes serve a bona fide community health need. For example, GCRMC provides direct support to diabetic, hepatitis C, sign language, Narcotics Anonymous, and cardiac and stroke patient support groups. GCRMC also conducts health fairs and health screening clinics for cholesterol, diabetes, blood pressure and blood type, and seminars in order to foster better health awareness. GCRMC additionally serves as an educational training site for registered nurses, x-ray technologists, medical technologists, physical therapists, emergency medical technicians, and nursing assistants in affiliation with New Mexico State University-Alamogordo, the University of New Mexico, and other universities, and participates in health fairs in order to foster better health awareness in the community. Finally, GCRMC directly engages in many other health-related community activities, such as Lamaze, breast feeding, new baby and sibling classes, and

CPR training to members of the community.

9.     GCRMC's contributions to community health are not limited to direct provision of services.  It also partners with Otero County and various localities within Otero County to support and fund the provision of medical services to patient populations with limited access to the Hospital.  GCRMC contributes to rural health clinics in Cloudcroft, Tularosa, and Chaparral, and supports medical services at the Otero County Detention Center.  Without GCRMC's support, these populations would have significantly less access to healthcare.

10.    GCRMC provides further support, both directly and indirectly, to over thirty community health and wellness programs, such as: The United Way, Relay for Life, and the Boys and Girls Club.  GCRMC's non-Hospital community contributions totaled approximately $1.15 million in the year ending June 2011.

11.    Through its numerous facilities, programs, and projects, GCRMC is directly or indirectly responsible for nearly all of Otero County's healthcare infrastructure.  GCRMC believes that the decision of every practicing physician in Alamogordo to commence his or her practice there was largely influenced by GCRMC and the presence of the Hospital.  In short, GCRMC is the lynchpin of healthcare services in Otero County.

12.    One of GCRMC's most fundamental and critical functions in maintaining Otero County's healthcare infrastructure is its active recruitment of healthcare providers, especially physicians, to meet specifically identified community needs.  Over the past two years, GCRMC has been responsible for bringing approximately twenty physicians to the community, including practitioners of endocrinology, obstetrics and gynecology, family medicine, pediatrics, orthopedics, internal medicine, psychiatry, general surgery, neurology, pathology, cardiology, and nephrology.  Offering direct employment to physicians has become an increasingly

important practice tool for hospitals throughout the country. As a result, Physicians will often only agree to come to the community if employed directly by GCRMC. Unfortunately, the practice has placed GCRMC at a greater litigation risk because claims against physicians employed directly by GCRMC are not compensable by the patient compensation fund established pursuant to the New Mexico Patient Malpractice Act.

### iv. GCRMC's Management

13. Since 1986, GCRMC has contracted the day to day management of the Hospital and its other healthcare services to Quorum Health Resources, LLC ("QHR"). QHR specializes in the management of community hospitals and currently has approximately 150 hospitals under management. Pursuant to GCRMC's current contract with QHR, QHR provides GCRMC with, among other things, highly skilled and experienced managers at the chief executive officer and chief financial officer positions, group purchasing privileges that significantly reduce GCRMC's costs, and access to an array of training opportunities and administrative resources that would not otherwise be available to a hospital of GCRMC's size. QHR has also provided GCRMC with a highly skilled and experienced chief administrative officer to assist management with the additional workload associated with this Chapter 11 Case. The ultimate decision-making authority of GCRMC rests with a board of directors comprised of ten volunteer community leaders.

14. Prior to its engagement of QHR in 1986, GCRMC suffered from financial weaknesses attributable in large part to its inability to provide the range of services necessary to fully service the local healthcare market. QHR assisted GCRMC in identifying the facilities and capabilities it lacked which were in-demand within the community. In response, GCRMC, in conjunction with QHR, developed a targeted growth plan, driven by identified community needs, that continues today. Since 1986, under QHR's management, GCRMC's gross revenue has

increased substantially, as has the number of medical providers in Otero County. Currently, GCRMC works with over 260 affiliated healthcare providers, including a full complement of subspecialists. The success of GCRMC's expansion efforts is well illustrated by the fact that over 70% of Otero County residents now use the Hospital for their healthcare needs, and approximately 80% of residents in Otero County who undergo inpatient surgical procedures do so at the Hospital.

15.     GCRMC's extraordinary growth during the course of its relationship with QHR reflects its commitment to providing the maximum range of services supportable by a community of Otero County's size. GCRMC has brought quality healthcare closer to home, and improved the overall health and quality of life of the people it serves. As a non-profit corporation, GCRMC's success equates to the community's success, as all profits earned from operations are reinvested in improvements to its facilities, services, and other health-related initiatives. In response to identified community needs, GCRMC is in the final stages of completing a wound care center and transitioning its existing double patient rooms to single patient rooms. On July 1, 2011, GCRMC opened an acute rehabilitation inpatient center.

**v.     Events Giving Rise to the Bankruptcy Filing**

16.     Since June 2010, GCRMC, along with QHR and a number of other defendants, has been subject to an onslaught of personal injury lawsuits stemming from a series of procedures performed at the Hospital (the "Lawsuits") between 2006 and 2008. In total, forty-seven individuals who underwent such procedures have filed the Lawsuits. Only two physicians, one operating independently and one employed by the Hospital, were involved in some manner with the Lawsuits. Currently, neither of the physicians implicated in the Lawsuits have any affiliation with GCRMC. Although the physicians are no longer with GCRMC, GCRMC's potential exposure in connection with the Lawsuits remains and poses a significant threat to its

ability to effectively carry out its mission. As the sole community healthcare provider in Otero County, the pendency of the Lawsuits has affected GCRMC's ability to raise the funds necessary to continue to meet the current and future healthcare needs of the community.

17.     GCRMC disputes the claims asserted in the Lawsuits, but recognizes that it faces significant uncertainty as well as administrative and financial burdens in defending the Lawsuits. Indeed, the Lawsuits have already impacted GCRMC's ability to obtain financing. GCRMC voluntarily filed its Petition with the objective of resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves.

**vi.     GCRMC's Capital Structure**

18.     For its current capital/debt structure prior to the Petition Date, GCRMC required capital in order to, among other things, (i) finance and reimburse the costs of constructing and implementing improvements to GCRMC (the "2007 Hospital Improvement Project") and; (ii) refinance existing debt obligations relating primarily to the construction of the Hospital in 1999.

19.     To provide GCRMC the capital necessary to fund construction in 2007 and to refinance preexisting debt, the City of Alamogordo, a political division of the State of New Mexico (the "City") issued (i) $30,465,000 in aggregate principal amount of its Hospital Improvement and Refunding Revenue Bonds (Gerald Champion Regional Medical Center Project) Series 2007A (the "Series 2007A Bonds"); and (ii) $8,020,000 in aggregate principal amount of its Taxable Hospital Improvement and Refunding Revenue Bonds (Gerald Champion Regional Medical Center Project) Series 2007B (the "Series 2007B Bonds," and, collectively with the Series 2007A Bonds, the "Bonds") pursuant to New Mexico law.

20.     The Bonds are governed by the terms of a trust indenture (the "Trust Indenture") entered into by the City and The Bank of New York Mellon Trust Company, N.A., as trustee (the

"Bond Trustee") on or about November 15, 2007.

21.     To establish an income stream to support payments under the Bonds, the City and the Debtor entered into that certain Lease Agreement (the "Lease Agreement") whereby the City leased the Hospital and certain related assets to GCRMC in exchange for lease payments (the "Lease Payments").  Pursuant to the terms of the Lease Agreement, the Debtor is obligated to keep in place at all times a letter of credit for the benefit of bondholders in an amount not less than the sum of all remaining obligations under the Bonds.

22.     To secure the payments under the Bonds, and in accordance with the terms of the Lease Agreement, the Debtor and Bank of America, N.A. (the "Bank") entered into that certain Letter of Credit and Reimbursement Agreement (the "Reimbursement Agreement"), whereby the Bank issued an irrevocable letter of credit in the amount of $38,927,842 in favor of the Trustee (the "Letter of Credit").  The Letter of Credit can be drawn by the Trustee under certain circumstances.  Under the Reimbursement Agreement, the Debtor must reimburse the Bank for any draws on the Letter of Credit.  The Debtor's obligations under the Reimbursement Agreement are secured by that certain Mortgage and Assignment of Rents and Leases, Security Agreement and Financing Statement (the "Mortgage"), recorded on November 15, 2007, granting a mortgage on the Hospital and associated real property and a first priority security interest in certain personal property used in connection with the Hospital, as evidenced by that certain Security Agreement by and between the Debtor and the Bank (the "Security Agreement").

23.     The Letter of Credit is drawn periodically to make all necessary debt service payments on the Bonds.  As the Letter of Credit is drawn, the payments pursuant to the Lease Agreement are directed to the Bank to cover the draws.

24.     The Letter of Credit expires on November 15, 2012.  The Debtor is unable to secure a replacement letter of credit with the existing Lawsuits pending.  If the Debtor fails to secure either (i) an extension to the Letter of Credit, or (ii) a replacement letter of credit by October 1, 2012, the Trustee is obligated to tender the Bonds for Redemption on November 10, 2012.  Such a tender would cause the Letter of Credit to be drawn and result in the Debtor owing all amounts paid under the Letter of Credit to Bank of America pursuant to the Reimbursement Agreement.  Put another way, the liabilities owed under the bonds would be, in effect, accelerated if the Letter of Credit cannot be extended or replaced.

25.     As of June 30, 2011, the current amounts outstanding under the Bonds were approximately $30.5 million in respect of the Series 2007A Bonds and approximately $6.5 million in respect of the Series 2007B Bonds.  As of June 30, 2011, the book value of the Debtor's current assets was approximately $32.1 million and the book value of the Debtor's current liabilities, exclusive of the Lawsuits, was approximately $20.2 million.  In November 2011, without any prospect of replacing or extending the Letter of Credit, the Debtor's current liabilities will jump to approximately $57.1 million.  Without any ability to extend or replace the Letter of Credit, the Debtor will be unable to satisfy its current liabilities out of its current assets.  This could have a significant impact on the Debtor's operations.

26.     In order to avoid this eventuality, the Debtor commenced this Chapter 11 Case to provide a framework for the fair and expeditious resolution of the Lawsuits.  Once the Lawsuits are resolved, the Debtor expects to have renewed access to capital markets, permitting it to extend or refinance the Letter of Credit and refocus its attention on fulfilling its mission to provide quality healthcare services to its community.

**B.     Background Facts Specific to the Motion**

27.     In the ordinary course of business, the Debtor maintains a corporate risk program

pursuant to which the Debtor procures numerous insurance policies (each, as may be revised, extended, supplemented, renewed, or changed, an "Insurance Policy," and collectively, the "Insurance Policies").  The Debtor maintains the Insurance Policies in amounts and types of coverage in accordance with applicable law, as is necessary and prudent, and pursuant to contractual obligations.  The Insurance Policies provide coverage for, among other things, general liability, worker's compensation, employer's liability, hospital professional liability, directors' and officers' liability, and property losses.

28.    The annual premiums under the Debtor's 2011 Insurance Policies total approximately $8,004,381.  The current carriers of the Insurance Policies (as may be revised, extended, supplemented, renewed, or changed, the "Insurance Carriers") are set forth in Exhibit A, attached hereto, along with the corresponding type of coverage and individual annual premiums.  The Debtor believes that no prepetition amounts are owing in respect of any of the Insurance Policies.

i.    **Policies with Financed Premiums**

29.    The Debtor's hospital professional, general liability, umbrella, and excess insurance premiums (the "Darwin Premiums") were financed pursuant to a premium finance agreement (the "Premium Finance Agreement") between the Debtor, as insured, and Western Commerce Bank ("WCB"), as lender.  Under the Premium Finance Agreement, the Debtor paid an initial down-payment and monthly installments thereafter to WCB in exchange for WCB's agreement to pay the full annual insurance premium, in advance, to the Debtor's insurers (the "Premium Finance Program").  The total annual premiums under the Insurance Policies covered by the Premium Finance Agreement for the 2011 policy period were $1,991,314.77.  The down-payment under the Premium Finance Agreement was $497,828.70 and, after assessment of a $25,789.43 finance charge, the Debtor financed a total of $1,519,275.50.  The financed amount

was payable in 10 monthly installments of $151,927.55, due on the ninth day of each month.  As of the Petition Date, the Debtor believes that it is current on its obligations to WCB under the Premium Finance Agreement.

30.     The Debtor's obligations under the Premium Finance Agreement are secured by all unearned premiums or dividends payable to the Debtor under the Insurance Policies covered by the Premium Finance Agreement, as well as any loss payments.  Under the Premium Finance Agreement, WCB is appointed the Debtor's attorney-in-fact with authority to, among other things, cancel the Insurance Policies in the event of non-payment.

### ii.      Policies without Financed Premiums

31.     The Debtor does not finance any premiums under its Insurance Policies other than the Darwin Premiums.  Premiums payable under the Insurance Policies that are not financed are paid in accordance with the applicable agreement governing each such Insurance Policy.  As of the Petition Date, the Debtor believes that is has no prepetition obligations owing on account of any of is Insurance Policies without financed premiums.  Accordingly, the relief requested herein is necessary with respect to its Insurance Policies that are not financed pursuant to the Premium Finance Agreement only if there are any unanticipated fees or charges payable that may be characterized as prepetition debts.  The Debtor requests such relief out of an abundance of caution.

### C.      The United States Trustee Guidelines

32.     As a debtor in possession, the Debtor is obligated to abide by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (rev. Jan. 6, 2010) established by the Office of the United States Trustee for Region 20 (the "UST

Guidelines")³  Among other things, the UST Guidelines require that a debtor maintain

appropriate insurance coverage, including "coverage customary or prudent in the debtor's

business, or required by law."  UST Guidelines 2-3.  The UST Guidelines further require that the

debtor provide the UST with proof of such insurance within the fifteen days following the

petition date.  *Id.* at 2.

## II.

## <u>JURISDICTION</u>

33.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334, and Miscellaneous Order No. 84-0324 filed in the United States District Court for the

District of New Mexico on March 19, 1992.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## <u>RELIEF REQUESTED</u>

34.     By this Motion, pursuant to sections 105, 361, 362, 363 and 364 of the

Bankruptcy Code and the UST Guidelines, the Debtor respectfully requests authorization to

(i) maintain insurance coverage, in the exercise of its reasonable business judgment, in

accordance with prepetition practices, including authority to revise, extend, supplement, renew

or change insurance coverage as needed; (ii) maintain its Premium Finance Program including

authority to renew, supplement or enter new financing arrangements as needed; and (iii) pay any

prepetition and postpetition obligations associated therewith.  As of the Petition Date, the twelve-

month average monthly premium for its Insurance Policies was approximately:  (i) $165,943

with respect to those Insurance Policies financed under the Premium Finance Agreement; and (ii)

---

³          The UST Guidelines are available at http://www.justice.gov/ust/r20/docs/general/ch11_guidelines.pdf.

$297,630 with respect to those Insurance Policies not financed under the Premium Finance Agreement.

35.     In addition, by this Motion, the Debtor respectfully requests an order preventing the Insurance Carriers from giving any notice of termination or otherwise modifying or canceling any Insurance Policies without obtaining from this Court relief from the automatic stay currently in effect pursuant to section 362 of the Bankruptcy Code.

**IV.**

**BASIS FOR RELIEF**

A.     **Payment of the Financed Premiums Is Proper Because the Premium Finance Company May be Entitled to Adequate Protection**

36.     The Premium Finance Agreement is collateralized by, *inter alia*, the Insurance Policies' unearned premiums, and therefore, affords WCB secured status.  Security interests created by premium finance arrangements are generally recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums financed pursuant to such agreements.  *See TIFCO, Inc. v. U.S. Repeating Arms Co.*, 67 B.R. 990, 994-95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp. (In re Auto-Train Corp.)*, 9 B.R. 159, 164-66 (Bankr. D.D.C. 1981).  Upon the Debtor's default under the Premium Finance Agreement, WCB could argue that it is a secured creditor and seek relief from the automatic stay to cancel the Insurance Policies in accordance with the terms of the Premium Finance Agreement, or seek relief from the Court for payment of the premium payments due as adequate protection of its investment.  *See, e.g.*, *In re Universal Motor Express, Inc.*, 72 B.R. 208, 210 (Bankr. W.D.N.C. 1987).

37.     Under section 361 of the Bankruptcy Code, financiers of insurance premiums, as purported secured creditors, are generally entitled to adequate protection of the value of their security to protect them against the diminution in the value of their collateral.  *See* 11 U.S.C.

§ 361. Adequate protection may take many forms, including authority to apply unearned premiums to the outstanding debt. Where the unearned premiums have diminished to less than the amount of the outstanding debt, cash payments may be necessary to provide adequate protection of the insurance premium financier's interest. *See TIFCO*, 67 B.R. at 999.

38. Pursuant to the Premium Finance Agreement, the Debtor believes that WCB could maintain a security interest in the Debtor's unearned premiums, and therefore, pursuant to section 363(e) of the Bankruptcy Code, WCB may be entitled to adequate protection of its interests in the unearned premiums. The Debtor's failure to provide such adequate protection– for example, by failing to pay the ongoing installments due under the Premium Finance Agreement–may constitute cause under section 362(d) of the Bankruptcy Code for WCB to obtain relief from the automatic stay and terminate the underlying Insurance Policies.

**B.      Payment of the Non-Financed Premiums Is Proper under the Doctrine of Necessity**

39. The Debtor submits that payment of the premiums due with respect to the Insurance Policies is appropriate pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, as well as the "necessity of payment" doctrine. Section 363 of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). In order to do so, "the debtor must articulate some business justification, other than the mere appeasement of major creditors[.]" *Id.* As set forth below, the Debtor has a sound business justification for payment of the premiums related to the Insurance Policies.

40. Pursuant to section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]." 11 U.S.C. § 105(a). Under the doctrine of necessity, a bankruptcy court may exercise its equitable powers under section 105(a) to authorize a debtor to pay certain critical prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 824 (D. Del. 1999) (bankruptcy courts may exercise equitable powers to authorize payment of prepetition debt where such payment is necessary to preserve the going concern value of a debtor's business); *Ionosphere Clubs*, 98 B.R. at 175 (section 105 empowers bankruptcy courts to authorize payment of prepetition debt "when such payment is needed to facilitate the rehabilitation of the debtor").

41.    To the extent there has been reluctance to rely solely on section 105(a) or the doctrine of necessity, several courts have authorized payment of critical prepetition claims, or implied that such authority would be granted, by relying on section 105(a) in conjunction with other sections of the Bankruptcy Code. *See, e.g.*, *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 19-20 (Bankr. M.D. Fla. 2005) (acknowledging that, in certain circumstances, section 363(b)(1) might authorize payment of prepetition claims if it was shown that such payment would "enable a successful reorganization and make even the disfavored creditors better off"); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (noting that the preplan satisfaction of prepetition claims may be necessary to satisfy a debtor's fiduciary duties under sections 1106 and 1107 of the Bankruptcy Code).

42.    As a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor is a fiduciary with a "duty to maximize the value of the bankruptcy estate." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). "The debtor-in-possession's fiduciary duty to

maximize includes the 'duty to protect and conserve property in its possession for the benefit of creditors.'" *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (*citing In re Marvel Entm't Grp.*, 140 F.3d 463, 474 (3d Cir. 1998)). Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497. The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

43.     Recognizing the necessity of preserving the value of the debtor's estate by the maintenance of insurance coverage, the United States Trustee for Region 20 requires a chapter 11 debtor to maintain insurance coverage as a debtor in possession. The UST Guidelines require that the Debtor shall maintain those categories of insurance coverage, as appropriate, set forth therein, including coverage customary or prudent in the debtor's business, or as required by law. UST Guidelines 2-3. In addition, it is critical that the Debtor maintains its Insurance Policies in order to provide a comprehensive range of coverage that protects its business and properties. The Debtor's current coverage is also necessary to replace loss of business income after the occurrence of a major loss event that involves any type of business interruption. As noted above, many of the coverage requirements are mandated by law or by the contracts governing the Debtor's commercial activities. If these policies were allowed to lapse, or if WCB were able to obtain relief to cancel the Insurance Policies covered by the Premium Finance Agreement, the Debtor would be exposed to substantial liability for any damages resulting to persons and property of the Debtor and others and potentially in breach of applicable laws and contracts.

44.     Further, if the Debtor is not permitted to pay the premiums necessary to maintain the Insurance Policies, it may be unable to find alternative insurance carriers willing to offer it

insurance under similar terms to its existing policies. While the Debtor questions the right of any insurer to terminate the Insurance Policies for non-payment of premiums, any litigation associated with such alleged termination would be contested, and thus, very costly to the Debtor's estate.

45.      Finally, the Debtor expended considerable time and effort to secure its Insurance Policies, particularly those financed pursuant to the Premium Finance Agreement. Such effort was necessary because law and general prudence require that the Debtor maintains, among other things, professional and general liability coverage in its operation of the Hospital. Now, the UST additionally requires that the Debtors maintain such coverage. If any of the Insurance Policies were terminated, the Debtor would be forced to expend considerable effort in securing replacement Insurance Policies, distracting from its responsibilities to operate its business as a debtor in possession and to successfully reorganize.

46.      Prepetition premiums or other amounts due and owing, if any, on the Insurance Policies and Premium Finance Agreement are minimal as compared to the potential costs to the Debtor of non-payment. Based upon the foregoing, the relief requested herein is justified.

**C.      Insurance Carriers Should be Prevented from Giving Notice of Termination or Otherwise Modifying or Canceling the Insurance Policies Without First Obtaining Relief from the Automatic Stay**

47.      The Debtor also requests that the Court prevent the Insurance Carriers from giving any notice of termination or otherwise modifying or canceling any Insurance Policies without obtaining relief from the automatic stay imposed by section 362 of the Bankruptcy Code. The purpose of this relief is to aid in the administration of the Bankruptcy Case and to protect the Debtor's prospects for reorganization. The Debtor's Insurance Carriers may be unfamiliar with the protections afforded chapter 11 debtors under section 362 of the Bankruptcy Code, and thus, an order of this Court affirming these protections may help avoid costly and unnecessary

litigation.

48.     As a result of the commencement of the Debtor's chapter 11 case, and by operation of law pursuant to section 362 of the Bankruptcy Code, the automatic stay prevents all persons from, *inter alia*, (i) commencing or continuing any judicial, administrative or other proceeding against the Debtor; (ii) taking any action to exercise control over property of the estate; or (iii) taking any action to collect, assess, or recover a claim against the Debtor that arose before the commencement of such case. *See* 11 U.S.C. § 362(a).

49.     The appropriate procedure for obtaining Court approval of termination under an insurance policy is to seek relief from the automatic stay under the provisions of section 362(d)(1) of the Bankruptcy Code, which require the Court to grant relief for "cause." *In re Adana Mortg. Bankers, Inc.*, 12 B.R. 977, 983 (Bankr. N.D. Ga. 1980).

50.     The injunctions contained in section 362 of the Bankruptcy Code are self-executing and constitute fundamental debtor protections, which, in combination with other provisions of the Bankruptcy Code, provide the Debtor with the "breathing spell" that is essential to the Debtor's ability to reorganize. *See, e.g.*, *Maritime Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).

51.     As fundamental as the foregoing protections may be, and notwithstanding that they arise as a matter of law upon the commencement of a chapter 11 case, not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of the Bankruptcy Code provisions or cognizant of their significance and impact. Experience has shown that it is often necessary to advise third parties of the existence and effect of section 362 of the Bankruptcy Code and, occasionally, it is necessary to commence proceedings in the bankruptcy court to enforce the protections contained therein.

52.     The Debtor submits that this Court has ample authority to grant the relief sought herein.  Under section 105(a) of the Bankruptcy Code, "the Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The purpose of section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."  2 Collier on Bankruptcy ¶ 105.01 at 105-06 (15th ed. 2006) (collecting cases).  This is consistent with the broad equitable authority of the bankruptcy courts.  *See, e.g.*, *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990).

53.     Accordingly, the Debtor believes that, under the circumstances of this Bankruptcy Case, entry of the proposed order, which incorporates a restatement of the applicable provisions of section 362 of the Bankruptcy Code, would help protect the Debtor from violations of these crucial provisions by Insurance Carriers or WCB.  It would also spare the Debtor from the burden and expense of commencing proceedings to enforce the Bankruptcy Code.  Accordingly, an order entered by this Court enforcing the automatic stay may increase substantially the efficiency of the administration of this case.

54.     To the extent an Insurance Policy or a Premium Finance Agreement is deemed an executory contract, within the meaning of section 365 of the Bankruptcy Code, the Debtor does not by this Motion intend to assume such agreement.  Court authorization of payment *shall not* be deemed to constitute postpetition assumption or adoption thereof as an executory contract pursuant to section 365 of the Bankruptcy Code.  The Debtor is in the process of reviewing the Insurance Policies and Premium Financing Agreement and reserves all of its rights under the Bankruptcy Code with respect thereto.

# V.

## REQUESTS FOR IMMEDIATE RELIEF AND WAIVER OF STAY

55.     Pursuant to Rules 6003(b) and 6004(h) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), the Debtor seeks (a) immediate entry of an order granting

the relief sought herein; and (b) a waiver of any stay of the effectiveness of such an order.

56.     Pursuant to Bankruptcy Rule 6003, the Court may grant relief within twenty-one

(21) days after the filing of the petition regarding a motion to pay all or part of a prepetition

claim only if such relief is necessary to avoid immediate and irreparable harm.  Here, the relief

requested is necessary to avoid immediate and irreparable harm to the Debtor's estate for the

reasons as set forth above.  Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief

requested herein should be granted.

57.     The Debtor requests a waiver of any stay of the effectiveness of the order

approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[an] order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14)

days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As

set forth above, maintaining the Debtor's Insurance Policies and Premium Financing Agreement,

paying all obligations associated therewith, and preventing cancelation of the Insurance Policies

without obtaining stay relief are critically important to prevent irreparable damage to the

Debtor's estate and necessary in the exercise of the Debtor's duties to safeguard, preserve and

maintain its estate for the benefit of creditors.  Accordingly, the Debtor submits that ample cause

exists to warrant a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

# VI.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of an order (i) granting the relief requested herein; and (ii) granting the Debtor such other and further relief as the Court deems just and proper.

Dated: August 16, 2011
      Albuquerque, New Mexico

WHITE & CASE LLP

By:  /s/ Craig H. Averch      
     Craig H. Averch
     (*pro hac vice pending*)
     Roberto J. Kampfner
     (*pro hac vice pending*)
     633 West Fifth Street, Suite 1900
     Los Angeles, California 90071
     Telephone: (213) 620-7700
     Facsimile: (213) 452-2329
     caverch@whitecase.com
     rkampfner@whitecase.com

     *Proposed Attorneys for the Debtor in Possession*

     —and—

John D. Wheeler
New Mexico State Bar No. 7662
JOHN D. WHEELER & ASSOCIATES, PC
500 East Tenth Street, Suite 305
Alamogordo, New Mexico 88310
Telephone:    (575) 437-5750
Facsimile:    (575) 437-3557
jdw@jdw-law.com

*Proposed Special Counsel for the Debtor in Possession*

## NOTICE

Notice of this Motion was served via facsimile or electronic mail to (i) the Top 20 Largest Unsecured Creditors, (ii) the Office of the United States Trustee, (iii) counsel for Bank of America, (iv) counsel for the Lawsuit plaintiffs, and (v) the New Mexico Attorney General; and by United States mail on the following parties:

/s/ Craig H. Averch
Craig H. Averch

| | |
|---|---|
| American Hallmark Insurance Co. of Texas<br>777 Main Street, Suite 1000<br>Fort Worth, TX 76102 | Fidelity National Insurance – Flood<br>PO Box 33003<br>St. Petersburg, Florida 33733-8003 |
| AmWINS Brokerage of Texas, Inc<br>5910 North Central Expressway, Suite 500<br>Dallas, TX 75206 | Lincoln National Life Insurance Company<br>8801 Indian Hills Drive<br>Omaha, NE 88114-4066 |
| Anthem Life Insurance Company<br>PO Box 182361<br>Columbus, OH 43218-2361 | NM Hospital Workers' Comp Group<br>PO Box 92200<br>Albuquerque, NM 87199-220 |
| Blue Cross Blue Shield of New Mexico,<br>A Division of Healthcare Services Corp,<br>A Mutual Legal Reserve Company<br>5701 Balloon Fiesta Parkway, NE<br>Albuquerque, NM 87113<br>PO Box 27630<br>Albuquerque, NM 87125-7630 | Ohio Casualty Bond<br>9450 Seward Road<br>Fairfield, OH 45014 |
| CNA<br>333 West Wabash Avenue<br>C/O Billing & Collections 29s<br>Chicago, IL 60604-4107<br>CNA Equipment Breakdown Risk Control<br>600 North Pearl Street, 13th Floor<br>Dallas, TX 75201 | Ohio Casualty Group<br>9450 Seward Road<br>Fairfield, OH 45014 |
| Darwin National Assurance Company<br>9 Farm Springs Road<br>Farmington, Connecticut 06032 | Western Surety Company<br>101 S Phillips Avenue<br>Sioux Falls, SD 57104-6703 |

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

| | |
|---|---|
| In re | |
| | No. 11-11-13686-_____A |
| OTERO COUNTY HOSPITAL ASSOCIATION, INC. (d/b/a Gerald Champion Regional Medical Center), | **Re Docket No. _____** |
| Debtor. | |

## ORDER (I) AUTHORIZING DEBTOR TO (A) MAINTAIN INSURANCE PROGRAMS, (B) MAINTAIN INSURANCE PREMIUM FINANCING PROGRAMS, (C) PAY INSURANCE PREMIUMS IN THE ORDINARY COURSE, AND (D) PAY ALL OBLIGATIONS ASSOCIATED THEREWITH; AND (II) PREVENTING INSURANCE COMPANIES FROM GIVING ANY NOTICE OF TERMINATION OR OTHERWISE MODIFYING OR CANCELING ANY INSURANCE POLICY <u>WITHOUT OBTAINING RELIEF FROM THE AUTOMATIC STAY</u>

Upon the motion of the Otero County Hospital Association, Inc. d/b/a Gerald Champion

Regional Medical Center ("<u>GCRMC</u>," or, the "<u>Debtor</u>"), pursuant to 11 U.S.C. §§ 105, 361, 362,

363 and 364 and the UST Guidelines[1] for entry of an order (i) authorizing the Debtor to

(a) maintain insurance programs in accordance with prepetition practice, including authority to

revise, extend, supplement, renew or change insurance coverage as needed, (b) maintain

insurance premium financing programs, including authority to renew, supplement or enter new

financing arrangements as needed, and (c) pay any prepetition and postpetition obligations

associated therewith; and (ii) preventing insurance companies from giving any notice of

termination or otherwise modifying or canceling any insurance policies without first obtaining

relief from the automatic stay imposed by 11 U.S.C. § 362 (the "<u>Motion</u>"), all as more fully set

forth in the Motion; and upon consideration of the *Affidavit of William Morgan Hay in Support*

*of First Day Motions and Applications*; and it appearing that the Court has jurisdiction over this

matter; and it appearing that due notice of the Motion as set forth therein is sufficient under the

---

[1] Where the context requires, each capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Motion.

circumstances, and that no other or further notice need be provided; and it further appearing that the relief requested in the Motion is in the best interests of the Debtor and its estate and creditors; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtor is authorized to continue and maintain the Insurance Policies on an uninterrupted basis, consistent with the practices in effect prior to the Petition Date; and it is further

ORDERED that the Debtor is authorized to continue the Premium Finance Agreement in the ordinary course of business, and enter into new premium finance arrangements postpetition; and it is further

ORDERED that the Debtor is authorized to pay all premiums and other amounts due and owing or accrued as of the Petition Date with respect to the Insurance Policies and Premium Finance Agreement, including payments to premium finance companies and insurance brokers in connection with postpetition services rendered; and it is further

ORDERED that, to the extent that an Insurance Policy or a Premium Finance Agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, payment pursuant to this Order shall not be deemed to constitute postpetition assumption or adoption of the policy or agreement as an executory contract pursuant to section 365 of the Bankruptcy Code; and it is further

ORDERED that nothing in this Order is intended or shall be construed to constitute relief from the automatic stay pursuant to section 362 of the Bankruptcy Code; and it is further

ORDERED that Insurance Carriers are hereby prohibited from giving any notice of termination or otherwise modifying or canceling any Insurance Policies without first obtaining relief from the automatic stay imposed by section 362 of the Bankruptcy Code; and it is further

ORDERED that, notwithstanding the applicability of Bankruptcy Rules 6003 and 6004(h) or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order.

_____
United States Bankruptcy Judge

Proposed Order Submitted by:

Craig H. Averch
(*pro hac vice pending*)
Roberto J. Kampfner
(*pro hac vice pending*)
WHITE & CASE LLP
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
Telephone:       (213) 620-7700
Facsimile:       (213) 452-2329
caverch@whitecase.com
rkampfner@whitecase.com

*Proposed Attorneys for the Debtor in Possession*

John D. Wheeler
New Mexico State Bar No. 7662
JOHN D. WHEELER & ASSOCIATES, PC
500 East Tenth Street, Suite 305
Alamogordo, New Mexico 88310
Telephone:       (575) 437-5750
Facsimile:       (575) 437-3557
jdw@jdw-law.com

*Proposed Special Counsel for the Debtor in Possession*