| | |
|---|---|
| In re<br><br>OTERO COUNTY HOSPITAL ASSOCIATION, INC. (d/b/a Gerald Champion Regional Medical Center),<br><br>Debtor. | No. 11-11-13686-_____A |

## DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, AND 363 AND BANKRUPTCY RULE 4001(d) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR ENTRY OF AN INTERIM AND FINAL ORDER (I) APPROVING STIPULATION BY AND BETWEEN THE DEBTOR AND BANK OF AMERICA, N.A. PROVIDING ADEQUATE PROTECTION AND AUTHORIZING USE OF CASH COLLATERAL; (II) APPROVING PAYMENT OF STIPULATION FEE; (III) SCHEDULING A <u>FINAL HEARING AND (IV) GRANTING RELATED RELIEF</u>

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The Otero County Hospital Association, Inc. d/b/a Gerald Champion Regional Medical Center ("GCRMC," or, the "Debtor"), pursuant to sections 105(a), 361, and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), hereby files its *Motion Pursuant to 11 U.S.C. §§ 105, 361, and 363 and Bankruptcy Rule 4001(d) of the Federal Rules of Bankruptcy Procedure for Entry of An Interim and Final Order (I) Approving Stipulation By and Between the Debtor and Bank of America, N.A, Providing Adequate Protection and Authorizing the Use of Cash Collateral; (II) Approving Payment of Stipulation Fee; (III) Scheduling a Final Hearing and (IV) Granting Related Relief* (the "Motion") and respectfully represents as follows:

# I.

## 4001(d) Statement

1.      Pursuant to Bankruptcy Rule 4001(d), the Debtor provides the following (i) concise statement of the relief requested in this Motion, and (ii) list of material provisions of the Stipulation By and Between the Debtor and Bank of America, N.A. Providing Adequate Protection and Authorizing the Use of Cash Collateral (the "Stipulation") attached hereto as Exhibit A, including the provisions of the type listed in Bankruptcy Rule 4001(c)(1)(B).  Fed. R. Bankr. P. 4001(d)(1)(B).

### A.      Statement of Relief Requested

2.      By this Motion, the Debtor seeks the entry of the Stipulation, which authorizes the Debtor to use cash and provide adequate protection to Bank of America, N.A. (the "Bank") pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(d). Specifically the Stipulation provides the following:[1]

- The Debtor represents, warrants, acknowledges and admits that (i) the Prepetition Obligations[2] constitute legal, valid and binding obligations (Stipulation, ¶ 1(a)); and (ii) the Debtor and its estate do not have any Claims (as defined in the Bankruptcy Code), counterclaims, actions, causes of action, debts, damages, demands, liabilities, obligations, suits, judgments, executions, expenses, defenses or setoff rights against the Bank or the Released Parties (*Id.* at ¶1(c)).

- The Debtor releases the Released Parties, including the Bank, from any and all Claims, counterclaims, actions, causes of action, debts, damages, demands, liabilities, obligations, suits, judgments, executions, expenses, defenses or setoff rights relating to the Prepetition Financing Documents

---

[1]      This summary is qualified in its entirety by the Stipulation and is intended solely to give the Bankruptcy Court and interested parties a brief overview of the significant terms of the Stipulation and comply with Bankruptcy Rule 4001(d).  Interested parties should refer to the Stipulation for the complete and detailed terms thereof.

[2]      Capitalized terms used herein, but not defined herein, have the meanings ascribed to such terms in the Stipulation.

and Prepetition Obligations, the Prepetition Collateral, and the Lease (*Id.* at ¶ 1(d)).

- The Debtor acknowledges that the Bank's Prepetition Liens are valid, binding, perfected, enforceable, first priority liens upon and security interest in all of the Prepetition Collateral (*Id.* at ¶ 1(e)).

- The Debtor grants the Bank adequate protection in the form of Replacement Liens (*Id.* at ¶ 2(a)) and a superpriority claim with certain exceptions (*Id.* at ¶ 2(b)).  Such Replacement Liens and superpriority claims do not include liens upon avoidance actions or their proceeds.

- The Stipulation authorizes the Debtor to perform its obligations under the Lease and the Prepetition Financing Documents, including by paying all amounts due on the Bonds when due.

- The Debtor is authorized to use Cash Collateral in its reasonable business judgment and to use commercially reasonable efforts to comply with a Budget, attached to the Stipulation as Exhibit A.  Importantly, the failure to comply with the Budget does not result in a default under the Stipulation.  (*Id.* at ¶ 4).

- The Bank agrees that it will forbear from causing the Indenture Trustee to redeem the Bonds on account of the commencement of the Case and will grant the Debtor covenant relief by reducing the "cash on hand" requirement in the Reimbursement Agreement from 110 days to 75 days.[3] (*Id.* at ¶ 7).

- The Replacement Liens are subject to the Carve-Out, which includes required payments of U.S. Trustee's fees as well as estate professional fees not to exceed $250,000.  (*Id.* at ¶ 5).

- The Debtor shall be entitled to obtain certain purchase money financing form third parties without the consent of the Bank.  (*Id.* at ¶ 7(c)).

- The Debtor shall file a motion to assume the Lease on or before August 31, 2011.  (*Id.* at ¶ 8).

- The Debtor shall pay a stipulation fee to the Bank in the amount of $225,000.  (*Id.* at ¶ 11).

---

[3]     The "cash on hand" covenant in the Reimbursement Agreement (Section 5.1(q)) actually requires that the Debtor maintain 130 days cash on hand, but does not provide for an "Event of Default" under the Reimbursement Agreement to occur until the Debtor's cash on hand falls below 110 days.  Under the Stipulation, no Event of Default will occur until the Debtor's cash falls below 75 days cash on hand.

- Subject to the Carve Out, the Stipulation contains a waiver of the Debtor's section 506(c) rights.

## II.

## BACKGROUND

### A. General Background

1. On the date hereof (the "Petition Date"), the Debtor filed with this Court a voluntary petition (the "Petition") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy case (the "Bankruptcy Case" or the "Chapter 11 Case"). The Debtor is authorized to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No creditors' committee has yet been appointed in this case by the Office of the United States Trustee, nor has any trustee or examiner been requested or appointed.

### i. GCRMC's Business

2. GCRMC is a New Mexico non-profit corporation qualified to do business pursuant to section 501(c)(3) of the United States Internal Revenue Code as a public charity. Its mission is to provide healthcare services and education to the greater-Otero County community. In fulfilling its mission statement, GCRMC serves a total population of approximately 70,000 people. Since 1949, GCRMC has provided quality medical care regardless of race, creed, sex, national origin, disability, age, or financial means. Although payment for services rendered is critical to its operation, GCRMC believes that all individuals should have access to comprehensive, first-class medical services and healthcare education.

### ii. The Hospital

3. In accordance with its mission statement, GCRMC developed and operates the Gerald Champion Regional Medical Center (the "Hospital") in Alamogordo, New Mexico. The

Hospital, built in 1999, replaced GCRMC's then-existing facilities, which had been in use since 1949. The Hospital is the only acute care healthcare facility in Otero County and is over seventy-five miles driving distance from the closest comparable facility. The Hospital features, among other things, diagnostic imaging services (i.e., MRI, CAT scan, and nuclear medicine), cardiopulmonary services, gero-psych services, inpatient rehabilitation services, an intensive care unit, a maternal child unit, and sleep disorder study capabilities. It is also designated as a Level III trauma center. When the new facility opened in 1999, the Hospital received design awards and was recognized as a state-of-the-art community medical facility.

4.       In order to continue to provide first-class medical services, GCRMC is currently in the process of making major improvements to the Hospital, including converting the majority[4] of its double patient rooms to single patient rooms to improve infection control, ease of HIPAA compliance, and the overall patient experience. In total, the Hospital currently has ninety-nine licensed acute care beds, twelve gero-psychiatric beds, and twelve inpatient rehab beds.

5.       A significant volume of patients make use of the Hospital's facilities each year. On an average annual basis, the Hospital has approximately 4,400 admissions and 32,000 emergency room visits. Annually, it is also the site of approximately 600 infant deliveries, 2,100 in-patient surgical procedures and over 7,000 out-patient procedures. In accordance with its mission to provide healthcare to the entire community, GCRMC provides services through the Hospital to patients covered by limited reimbursement insurers such as Medicaid and the County Indigent Program. Many uninsured and underinsured patients are covered by GCRMC's charity care policy. Over the past three years, the average unreimbursed value of charity care provided was approximately $2.2 million per year.

---

[4]       Once this transition is complete, only the gero-psych rooms will remain double patient rooms to facilitate patient socialization.

6.     In connection with the development of the new facility in 1999, GCRMC entered into a sharing agreement with the Department of Defense whereby Air Force physicians from nearby-Holloman Air Force Base are credentialed to admit and treat Department of Defense beneficiaries.  The Hospital was among the first civilian healthcare facilities that permitted active duty physicians to practice medicine in a non-Department of Defense facility. This initiative has saved the Department of Defense nearly $5 million annually in operational costs and millions more in Military construction costs.

7.     The Hospital's sizeable staff makes GCRMC Otero County's largest non-governmental employer.  GCRMC relies upon a workforce of approximately 704 employees, including approximately 562 full time employees and 142 part time or as-needed employees.  On an annualized basis, GCRMC pays approximately $37.7 million in wages and salaries to its employees and an additional approximately $8.6 million in benefits.

### iii.     GCRMC's Commitment to Community Healthcare Beyond its Doors

8.     GCRMC's efforts to meet the healthcare needs of its community go well beyond the direct provision of care at the Hospital.  In addition to those core healthcare services, GCRMC provides many free or below-cost services throughout the year that GCRMC believes serve a bona fide community health need.  For example, GCRMC provides direct support to diabetic, hepatitis C, sign language, Narcotics Anonymous, and cardiac and stroke patient support groups.  GCRMC also conducts health fairs and health screening clinics for cholesterol, diabetes, blood pressure and blood type, and seminars in order to foster better health awareness. GCRMC additionally serves as an educational training site for registered nurses, x-ray technologists, medical technologists, physical therapists, emergency medical technicians, and nursing assistants in affiliation with New Mexico State University-Alamogordo, the University

of New Mexico, and other universities, and participates in health fairs in order to foster better health awareness in the community. Finally, GCRMC directly engages in many other health-related community activities, such as Lamaze, breast feeding, new baby and sibling classes, and CPR training to members of the community.

9.       GCRMC's contributions to community health are not limited to direct provision of services. It also partners with Otero County and various localities within Otero County to support and fund the provision of medical services to patient populations with limited access to the Hospital. GCRMC contributes to rural health clinics in Cloudcroft, Tularosa, and Chaparral, and supports medical services at the Otero County Detention Center. Without GCRMC's support, these populations would have significantly less access to healthcare.

10.      GCRMC provides further support, both directly and indirectly, to over thirty community health and wellness programs, such as: The United Way, Relay for Life, and the Boys and Girls Club. GCRMC's non-Hospital community contributions totaled approximately $1.15 million in the year ending June 2011.

11.      Through its numerous facilities, programs, and projects, GCRMC is directly or indirectly responsible for nearly all of Otero County's healthcare infrastructure. GCRMC believes that the decision of every practicing physician in Alamogordo to commence his or her practice there was largely influenced by GCRMC and the presence of the Hospital. In short, GCRMC is the lynchpin of healthcare services in Otero County.

12.      One of GCRMC's most fundamental and critical functions in maintaining Otero County's healthcare infrastructure is its active recruitment of healthcare providers, especially physicians, to meet specifically identified community needs. Over the past two years, GCRMC has been responsible for bringing approximately twenty physicians to the community, including

practitioners of endocrinology, obstetrics and gynecology, family medicine, pediatrics, orthopedics, internal medicine, psychiatry, general surgery, neurology, pathology, cardiology, and nephrology. Offering direct employment to physicians has become an increasingly important practice tool for hospitals throughout the country. As a result, Physicians will often only agree to come to the community if employed directly by GCRMC. Unfortunately, the practice has placed GCRMC at a greater litigation risk because claims against physicians employed directly by GCRMC are not compensable by the patient compensation fund established pursuant to the New Mexico Patient Malpractice Act.

                        **iv.    GCRMC's Management**

13.       Since 1986, GCRMC has contracted the day to day management of the Hospital and its other healthcare services to Quorum Health Resources, LLC ("QHR"). QHR specializes in the management of community hospitals and currently has approximately 150 hospitals under management. Pursuant to GCRMC's current contract with QHR, QHR provides GCRMC with, among other things, highly skilled and experienced managers at the chief executive officer and chief financial officer positions, group purchasing privileges that significantly reduce GCRMC's costs, and access to an array of training opportunities and administrative resources that would not otherwise be available to a hospital of GCRMC's size. QHR has also provided GCRMC with a highly skilled and experienced chief administrative officer to assist management with the additional workload associated with this Chapter 11 Case. The ultimate decision-making authority of GCRMC rests with a board of directors comprised of ten volunteer community leaders.

14.       Prior to its engagement of QHR in 1986, GCRMC suffered from financial weaknesses attributable in large part to its inability to provide the range of services necessary to

fully service the local healthcare market. QHR assisted GCRMC in identifying the facilities and capabilities it lacked which were in-demand within the community. In response, GCRMC, in conjunction with QHR, developed a targeted growth plan, driven by identified community needs, that continues today. Since 1986, under QHR's management, GCRMC's gross revenue has increased substantially, as has the number of medical providers in Otero County. Currently, GCRMC works with over 260 affiliated healthcare providers, including a full complement of subspecialists. The success of GCRMC's expansion efforts is well illustrated by the fact that over 70% of Otero County residents now use the Hospital for their healthcare needs, and approximately 80% of residents in Otero County who undergo inpatient surgical procedures do so at the Hospital.

15.     GCRMC's extraordinary growth during the course of its relationship with QHR reflects its commitment to providing the maximum range of services supportable by a community of Otero County's size. GCRMC has brought quality healthcare closer to home, and improved the overall health and quality of life of the people it serves. As a non-profit corporation, GCRMC's success equates to the community's success, as all profits earned from operations are reinvested in improvements to its facilities, services, and other health-related initiatives. In response to identified community needs, GCRMC is in the final stages of completing a wound care center and transitioning its existing double patient rooms to single patient rooms. On July 1, 2011, GCRMC opened an acute rehabilitation inpatient center.

### v.     Events Giving Rise to the Bankruptcy Filing

16.     Since June 2010, GCRMC, along with QHR and a number of other defendants, has been subject to an onslaught of personal injury lawsuits stemming from a series of procedures performed at the Hospital (the "Lawsuits") between 2006 and 2008. In total, forty-seven individuals who underwent such procedures have filed the Lawsuits. Only two physicians,

one operating independently and one employed by the Hospital, were involved in some manner with the Lawsuits. Currently, neither of the physicians implicated in the Lawsuits have any affiliation with GCRMC. Although the physicians are no longer with GCRMC, GCRMC's potential exposure in connection with the Lawsuits remains and poses a significant threat to its ability to effectively carry out its mission. As the sole community healthcare provider in Otero County, the pendency of the Lawsuits has affected GCRMC's ability to raise the funds necessary to continue to meet the current and future healthcare needs of the community.

17.     GCRMC disputes the claims asserted in the Lawsuits, but recognizes that it faces significant uncertainty as well as administrative and financial burdens in defending the Lawsuits. Indeed, the Lawsuits have already impacted GCRMC's ability to obtain financing. GCRMC voluntarily filed its Petition with the objective of resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves.

**B.     Background Facts Specific to the Motion**

18.      In 2007 the Debtor entered into a series of agreements to obtain approximately $38 million in financing. The financing was raised in a municipal bond offering made by the City of Alamogordo (the "City"), which is described in detail below. In summary, the City issued bonds to finance hospital improvements and operations at very favorable interest rates. In exchange, the Debtor transferred the Hospital, including the real property upon which the Hospital is located, to the City and agreed to lease it back pursuant to the terms of a lease agreement. The lease payments payable by the Debtor are in an amount sufficient for the City to make payments on the bonds when such payments become due.

19.     As further security for the bond offering, the Debtor obtained a letter of credit from the Bank in favor of the indenture trustee for the bonds. The Debtor is obligated to reimburse the Bank for draws made on the letter of credit pursuant to the terms of a

reimbursement agreement.  Such obligations, in turn, are secured, among other things, by the hospital and the equipment and supplies located therein.  The trust indenture gives the Bank the right to cause the indenture trustee to redeem the bonds through a draw on the letter of credit upon the occurrence of an "Event of Default" under the reimbursement agreement.  Events of Default include the Debtor's commencement of a chapter 11 case and the failure of the Debtor to maintain 110 days "cash on hand" (as defined in Section 5.1(q) of the Reimbursement Agreement).[5]

20.     The Debtor would suffer significant harm if the Bank were to cause the redemption of the bonds.  Among other things, such redemption would, in effect, accelerate the bonds saddling the Debtor with approximately $36 million of liabilities, which are currently payable under the lease in reasonable installments at favorable interest rates.  Not only would acceleration result in the Debtor having to restructure tens of millions of dollars of secured debt, but it would raise the Debtor's borrowing costs by approximately 4% per annum, further injuring the Debtor and its estate.

21.     In order to prevent the acceleration of the bonds as a result of the commencement of this Case, the Debtor contacted the Bank and attempted to negotiate an adequate protection stipulation that would prevent the redemption of the bonds while the Debtor attempted to resolve the Lawsuits in an fair and equitable manner.  After good faith arms' length negotiations, the Debtor and the Bank have tentatively reached an agreement that will do just that.  The Stipulation embodies the tentative agreement of the parties.

22.     The terms of the Stipulation are fairly simple.  The Bank will agree not to cause the redemption of the bonds on account of the commencement of this case, and will adjust the

---

[5] As noted above, the actual covenant requires that the Debtor maintain 130 days cash on hand, but no Event of Default occurs until cash falls below 110 days cash on hand.

"cash on hand" covenant set forth in Section 5.1(q) of the Reimbursement Agreement by reducing the required minimum days cash on hand from 110 to 75. In exchange, the Debtor will continue to make payments under the lease with the City when and as such payments become due and will provide adequate protection of the Bank's liens to protect the Bank's interest in its collateral, including by providing the Bank with certain replacement liens in the Debtor's assets and agreeing to pay certain costs and expenses in connection with this case, including legal fees and costs. The Debtor also acknowledges the validity of the Bank's liens and claims and releases the Bank from any liability in connection with the bond transaction (in each case, subject to a sixty day review period for the Creditors' Committee and any other party in interest). Finally, the Debtor will pay the Bank a fee of $225,000 in connection with its agreement to provide the covenant relief described below.

23.     The Stipulation is in the best interests of the Debtor and should be approved. It is absolutely critical for the Debtor to keep the bonds in place throughout these proceedings without acceleration. The Stipulation assures that this will occur on reasonable terms under the circumstances.

### i.     The Financing Documents

24.     On or about November 1, 2007, the City and The Bank of New York Trust Company, National Association, as trustee (the "Indenture Trustee"), entered into that certain Trust Indenture (the "Trust Indenture") to issue certain bonds to finance certain improvements and the operations of the Debtor.

25.     On or about that same date, pursuant to the Trust Indenture, the City issued (i) $30,465,000 in aggregate principal amount of its Hospital Improvement and Refunding Revenue Bonds (Gerald Champion Regional Medical Center Project) Series 2007A (the "Series 2007A Bonds") and (ii) $8,020,000 in aggregate principal amount of its Taxable Hospital Improvement

and Refunding Revenue Bonds (Gerald Champion Regional Medical Center Project) Series

2007B (the "Series 2007B Bonds," collectively with the Series 2007A Bonds, the "Bonds").  The

Series 2007A Bonds mature on July 1, 2037.  The Series 2007B Bonds mature on July 1, 2018.

Both the 2007A Bonds and 2007B Bonds are payable in yearly installments through maturity.

The aggregate balance on the Bonds as of June 30, 2011 was $36,955,000.

26.     In order to fund the payments due in respect of the Bonds, on or about November

1, 2007, the City and the Debtor entered into that certain Lease Agreement (the "Lease

Agreement") whereby the City leased the hospital, related health-care facilities, and equipment

(collectively, the "Facilities") to the Debtor.  The payments pursuant to the Lease Agreement

(the "Lease Payments") are in such amounts as are necessary to provide funds to the City to pay

the principal and purchase or redemption price and interest on the Bonds when due.

27.     On November 1, 2007, the City and the Debtor entered into that certain Tax

Regulatory Agreement (the "Tax Regulatory Agreement") in order to ensure compliance with the

Internal Revenue Code and Regulations thereunder (the "IRC") as to the Bonds so that interest

on the Series 2007A Bonds is and will remain excludible from gross income under the IRC.

28.     On or about that same day, the Debtor and the Bank entered into that certain

Letter of Credit and Reimbursement Agreement (the "Reimbursement Agreement"), whereby the

Debtor agreed to reimburse the Bank for any draws that may occur under that certain letter of

credit dated November 15, 2007 (the "Letter of Credit").[6]

29.     Immediately prior to the closing of the transactions contemplated by the Trust

Indenture, the City transferred all of its right, title and interest in and to the Facilities to the

---

[6]     The procedure for funding bond payments under the Lease is set forth in the Reimbursement Agreement.
In short, on the first day of each month, the Debtor makes a payment equal to monthly interest plus one-twelfth of
the yearly amortization due in respect of the bonds for the applicable year into a sinking fund.  Thereafter, the Bank
makes payments in respect of the Bonds when due through the Letter of Credit and deducts the amounts paid to
bond holders from the sinking fund.

Debtor (which included fee simple title to the real property upon which the Facilities are located) and the Debtor executed that certain Mortgage and Assignment of Rents and Leases, Security Agreement and Financing Statement (the "Mortgage Agreement") in favor of the Bank to secure the Debtor's obligations under the Reimbursement Agreement. The Mortgage Agreement was recorded on November 15, 2007 with the County Clerk of Otero County, New Mexico.

30.     Pursuant to the Mortgage Agreement, the Debtor granted the Bank a security interest and lien in and upon the collateral described therein (the "Mortgage Collateral"), which includes, among other things, the real property upon which the Facilities are situated and any proceeds thereof, any improvements on such real property, including all buildings and other structures, and all proceeds and rents relating to or arising out of such real property. Immediately after the Debtor executed the Mortgage Agreement, the Facilities were transferred to the City subject to the security interests and liens granted under the Mortgage Agreement, the Bonds were issued, and the Facilities were leased back to the Debtor pursuant to the Lease Agreement.

31.     On October 1, 2007, the Debtor also executed a Security Agreement (the "Security Agreement") in favor of the Bank to secure further the Debtor's obligations under the Reimbursement Agreement. The Security Agreement grants the Bank a security interest in and upon the collateral described therein (the "Security Agreement Collateral," and, together with the Mortgage Collateral, the "Prepetition Collateral"), including all machinery, furniture, fixtures and other equipment owned by the Debtor. A UCC-1 Financing Statement covering the Security Agreement Collateral was filed with the Secretary of State of New Mexico on November 14, 2007.

32.     The Tax Regulatory Agreement, Letter of Credit, Reimbursement Agreement, Mortgage Agreement and Security Agreement are referred to herein as the "Prepetition Financing Documents," and the obligations of the Debtor under or in connection with the Prepetition Financing Documents are referred to herein as the "Prepetition Obligations".

### ii.     The Adequate Protection Stipulation

33.     Under the Prepetition Financing Documents and he Trust Indenture, certain "Events of Default" may trigger acceleration of the Bonds or permit the Bank to cause the Indenture Trustee to redeem the Bonds through a draw on the Letter of Credit.  Such Events of Default include the filing of a voluntary petition under the Bankruptcy Code and a breach of the financial covenants set forth in the Reimbursement Agreement.  For example, Section 5.1(q) of the Reimbursement Agreement makes it an "Event of Default" for the Debtor to fail to maintain unrestricted cash and investments in an amount equal to or greater than 110 days "cash on hand," which is calculated by determining the amount needed to fund operating expenses (including interest) minus depreciation and amortization for a 110 day period.

34.     As noted above, the Debtor determined that a chapter 11 proceeding provides it with the best opportunity to resolve the disputes set forth in Lawsuits in a reasonable manner.  Nevertheless, the Debtor was concerned that a filing would cause the Bank to force the redemption of the Bonds prematurely.  The Debtor also determined that it likely would be unable to comply with the "cash on hand" requirements set forth in Section 5.1(q) of the Reimbursement Agreement and would need covenant relief to avoid a default.  As a result, prior to the Petition Date, the Debtor contacted the Bank in an effort to resolve these issues.

35.     After arms' length and good faith negotiations, on or about August 16, 2011, the Debtor and the Bank tentatively agreed to the terms of the Stipulation.

36.     The Stipulation contains the following material terms:[7]

- The Stipulation acknowledges that the Prepetition Obligations are valid, legal and biding on the Debtor and that the Prepetition Liens upon the Prepetition Collateral are valid, binding, perfected, enforceable first priority liens, in each case, subject to a sixty day review period by the Creditors' Committee and any other party in interest.  (Stipulation ¶¶ 1 and 16).

- The Stipulation provides the Bank with a release of claims relating to the Prepetition Financing Documents, the Prepetition Obligations and the Lease.  (*Id.* at ¶ 1(d)).

- The Stipulation provides the Bank with Replacement Liens upon all of the Debtor's assets.  The Replacement Liens upon personal property postpetition assets of the same type as the Bank's prepetition personal property collateral (which does not include receivables) will secure the Prepetition Obligations.  The Replacement Liens upon the Debtor's cash, cash equivalents and investments will be limited to an amount not to exceed 55 days' "cash on hand" (as defied in the Reimbursement Agreement) plus any postpetition diminution in the value of the Prepetition Collateral plus any diminution in the Debtor's cash, cash equivalents and investments.  The Replacement Liens upon all other assets of the Debtor, including real estate and accounts receivable will secure

---

[7]     This summary is qualified in its entirety by the Stipulation and is intended solely to give the Bankruptcy Court and interested parties a brief overview of the significant terms of the Stipulation.  Interested parties should refer to the Stipulation for the complete and detailed terms thereof.

only any diminution in the value of the Prepetition Collateral on or after the Petition Date. (*Id.* at ¶¶ 2(a) (v), (vi) and (vii)).

- The Stipulation provides the Bank with a superpriority section 507(b) claim to the extent the adequate protection provided by the Stipulation does not protect the Bank from postpetition diminution in the value of the Prepetition Collateral on or after the Petition Date. Stipulation ¶ 2(b).

- The Stipulation requires the Debtor to continue to perform its obligations under the Lease and the Prepetition Financing Documents. The Debtor will seek to assume the Lease via a separate motion, which will be filed on or before August 31, 2011. The Stipulation does not provide for the assumption of any Prepetition Financing Documents. (*Id.* at ¶ 3(a)).

- The Stipulation requires the Debtor to pay all fees due and payable to the Bank as well as the Bank's fees and costs. (*Id.* at ¶ 3(b)).

- The Stipulation authorizes the Debtor to use cash collateral in the exercise of its reasonable business judgment. A budget is attached to the Stipulation and the Debtor has agreed to use commercially reasonable efforts to comply with the Budget and to advise the Bank of any material deviations. Importantly, however, failure to comply with the budget is not a grounds for the Bank to terminate the use of Cash Collateral. (*Id.* at ¶ 4).

- The Stipulation contains a "Carve-Out" of $250,000, not including professional fees incurred pursuant to the budget and paid prior to a Termination Event under the Stipulation. (*Id.* at ¶ 5).

- The Stipulation prohibits the Bank from causing the redemption of the Bonds during the term of the Stipulation on account of the Debtor's commencement of this Case. Further, the Bank has agreed to reduce the "cash on hand" requirement in the Reimbursement Agreement from 110 days cash on hand to 75 days cash on hand. Finally, the Bank has agreed to permit the Debtor to continue to finance its capital expenditures through certain purchase money financing; <u>provided</u> that the Bank has a right of first refusal with respect to any such financing. (*Id.* at ¶ 7).

- The term of the Stipulation will commence on the Petition Date and terminate on the first to occur of February 16, 2012 and the occurrence of a Termination Event; <u>provided</u>, that that term can be extended with the consent of the Bank for two additional three month periods. (*Id.* at ¶ 10).

- Termination Events include the Debtor's failure to make payments under the Lease when due, the Debtor's failure to maintain at least $12 million cash on hand on any given day or $15 million cash on hand for five consecutive business days and the occurrence of "Events of Default" under the Reimbursement Agreement other than Events of Default related to the filing of the Case or the failure to maintain 110 days' cash on hand. (*Id.* at ¶ 12).

- Upon the occurrence of a Termination Event, the Bank is authorized to exercise its rights and remedies under the Prepetition Financing Documents; provided, that the Bank may not foreclose upon any collateral

with receiving relief from the automatic stay.  The Debtor agrees that any such motion can be heard on five (5) days notice.  (*Id.* at ¶ 13).

- The Stipulation provides for the payment of a $225,000 Stipulation Fee to the Bank.  (*Id.* at ¶ 11).

- The Stipulation provides any party in interest, including the Creditors Committee with sixty days to challenge the Bank's claims and liens and to assert claims against the Bank.  (*Id.* at ¶ 16).

- The Stipulation provides a waiver of the Debtor's section 506(c) rights.  (*Id.* at ¶ 18).

## III.

## JURISDICTION

37.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Miscellaneous Order No. 84-0324 filed in the United States District Court for the District of New Mexico on March 19, 1992.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## IV.

## RELIEF REQUESTED

38.     By this Motion and pursuant to sections 105, 361, and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(d), the Debtor seeks the entry of an interim order approving the Stipulation and setting a hearing to consider approval of the Stipulation on a final basis on or before September 16, 2011.  At the conclusion of such hearing, the Debtor requests that the Court enter an order approving the Stipulation on a final basis.

# V.

## ARGUMENT

39.     The Debtor believes that the Stipulation is in the best interests of the estate and should be approved by the Bankruptcy Court. First, the Stipulation will assure that the Bank does not cause the Trustee to redeem the Bonds prematurely. This provides a real and substantial benefit to the Debtor and its estate. Among other things, if the Bonds are redeemed, the Debtor will be faced with the task of restructuring tens of millions of dollars of secured debt that is currently nothing more than a contingent claim. In addition, the Debtor will lose the benefit of an extremely favorable interest rate. Indeed, the Debtor's borrowing costs will increase by 4% per annum if the Bonds are redeemed.

40.     Further, it is important to note that it is not at all clear whether, absent agreement, the Debtor could prevent the Bank from exercising some or all of its remedies under the Prepetition Financing Documents notwithstanding the Debtor's bankruptcy filing. The Debtor is not the obligor on the Bonds and has no direct relationship with the Indenture Trustee, and the right of the Bank to cause the Indenture Trustee to redeem the Bonds upon the occurrence of an "Event of Default" is contained in the Trust Indenture, to which the Debtor is technically not a party. Under such circumstances, the automatic stay may arguably not prevent the Bank from exercising its right to cause the Indenture Trustee to redeem the Bonds upon an Event of Default and certainly would not prevent the Indenture Trustee from making draws on the Letter of Credit.[8] Accordingly, the Stipulation is the only approach, short of litigation, to assure that the Bonds (and the favorable interest rates and payment terms) remain in place for the duration of this Case.

---

[8]     The Debtor does not concede that the automatic stay does not prevent the Bank from exercising its rights and remedies under the or in connection with the Trust Indenture and the Reimbursement Agreement and reserves its rights with respect all issues concerning the applicability of the automatic stay.

41.     Second, the adequate protection provided for in the Stipulation is reasonable under the circumstances.  The concept of the "adequate protection" of a secured creditor's interest in collateral, as required under Section 363 of the Bankruptcy Code, was derived by Congress from the constitutional protection of property interests granted by the Fifth Amendment, and is intended to "insure that the secured creditor receives the value for which he bargained."  S. Rep. No. 95-989, at 53 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5839; *accord* H.R. Rep. No. 95-595, at 339 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6295; *see also In re O.P. Held, Inc.*, 74 B.R. 777, 782-84 (Bankr. N.D.N.Y. 1987) (holding that secured lender must be assured of the maintenance and recoverability of its lien, and that debtor must prove that secured creditor will realize the value of its bargain); *In re Certified Corp.*, 51 B.R. 768, 771 (Bankr. D. Haw. 1985) (holding that secured creditors should not be deprived of the benefit of their bargain).

42.     Examples of adequate protection include, but are not limited to: periodic cash payments (11 U.S.C. § 361(1)), additional or replacement liens (11 U.S.C. § 361(2)), or such other relief as will provide the "indubitable equivalent" of the secured creditor's interest in the collateral (11 U.S.C. § 361(3)).  The law is clear that Section 361 of the Bankruptcy Code does not limit adequate protection to the enumerated examples, and it is well accepted that the Bankruptcy Code provides courts with authority to fashion adequate protection as they deem appropriate under the circumstances.  *See, e.g., In re O.P. Held, Inc.*, 74 B.R. at 782 (noting that Section 361 "has been consistently interpreted as not containing an exclusive list" of forms of adequate protection); *Lend Lease v. Briggs Transp. Co. (In re Briggs Transp. Co.)*, 780 F.2d 1339, 1344 (8th Cir. 1985) ("[I]t is generally acknowledged that, as demonstrated by the non-exclusive examples of Section 361, adequate protection is the protection of a secured creditor's

'interest in property' from any decrease in 'value' [sic] attributable to the stay. It also is generally accepted that the concept requires the debtor to propose some form of relief that will preserve a secured creditor's interest in the collateral.") (internal citations omitted).

43.     Here, the Stipulation grants the Bank three separate types of Replacements Liens as adequate protection, each of which falls within what is permitted by section 361 of the Bankruptcy Code. The first type of Replacement Lien consists of liens upon the "Replacement Collateral/Equipment," which is defined as personal property such as machinery, furniture, fixtures and equipment, whenever acquired. The Bank already has a lien the machinery, furniture, fixtures and equipment owned by the Debtor as of the Petition Date pursuant to the Prepetition Financing Documents. Accordingly, the Replacement Lien upon the Replacement Lien Collateral/Equipment does nothing more than generally maintain the status quo by assuring that the Bank's Prepetition Collateral is replaced with Replacement Collateral/Equipment as the Debtor modernizes its equipment. Importantly, the Replacement Collateral/Equipment does not include real property assets (other than fixtures) or accounts receivable.

44.     The second type of Replacement Lien consists of liens upon the "Liquidity Collateral," which consists of cash, cash equivalents and investments. The Bank currently does not have a lien upon such assets; however, the Debtor believes that, in its business judgment, the Replacements Liens upon the Liquidity Collateral are justified because such liens are to be granted as consideration for the Bank's agreement to reduce the "cash on hand" covenant in the Reimbursement Agreement from 110 to 75 days cash on hand. Without such concession, the Debtor could fall into default under the terms of the Reimbursement Agreement and the Bank could cause the Indenture Trustee to redeem the Bonds, as noted above, at great cost to the Debtor. Importantly, the Replacement Lien in the Liquidity Collateral is limited to an amount

equal to 55 days cash on hand, which the Debtor estimates to equal approximately $14.6 million, leaving the Debtor with substantial unencumbered cash over and above such amounts, including approximately $6.6 million as of the Petition Date.

45. Finally, the Stipulation provides the Bank with a Replacement Lien upon substantially all of the Debtor's other assets, ***not including avoidance actions***, but limits the amount of such Replacement Lien to any diminution in the value of the Prepetition Collateral occurring on or after the Petition Date. In light of the fact that the Debtor believes that the Bank is oversecured, such Replacement Liens will be of negligible value.

46. The other forms of adequate protection provided to the Bank in the Stipulation are also reasonable. For example, as a likely oversecured creditor, the Bank is entitled to the payment of its fees pursuant to section 506(b) of the Bankruptcy Code and, although the Stipulation does contain a release of claims by the Debtor, and an acknowledgement of the Bank's rights under the Prepetition Financing Documents, it also provides all parties in interest, including the Creditors' Committee (when appointed), with a sixty (60) day window to challenge the Bank's claims and liens and assert claims against the Bank.

47. Finally, the Debtor believes that, in its business judgment, the payment of the $225,000 "Stipulation Fee" is appropriate under the circumstances in light of the Bank's agreement to provide the Debtor with covenant relief as part of the Stipulation, especially in light of structure of the Bonds.

# VI.

## CONCLUSION

For the forgoing reasons, the Debtor respectfully requests that the Court enter an interim order approving the Stipulation, set a hearing to approve the Stipulation on a final basis on or before September 16, 2011, and enter such other relief as is just and proper.

Dated: August 16, 2011  
      Albuquerque, New Mexico

WHITE & CASE LLP

By: _/s/ Craig H. Averch_____  
    Craig H. Averch  
    (*pro hac vice pending*)  
    Roberto J. Kampfner  
    (*pro hac vice pending*)  
    633 West Fifth Street, Suite 1900  
    Los Angeles, California 90071  
    Telephone:  (213) 620-7700  
    Facsimile:  (213) 452-2329  
    caverch@whitecase.com  
    rkampfner@whitecase.com

    *Proposed Attorneys for the Debtor in Possession*

    —and—

John D. Wheeler  
New Mexico State Bar No. 7662  
JOHN D. WHEELER & ASSOCIATES, PC  
500 East Tenth Street, Suite 305  
Alamogordo, New Mexico 88310  
Telephone:    (575) 437-5750  
Facsimile:    (575) 437-3557  
jdw@jdw-law.com

*Proposed Special Counsel for the Debtor in Possession*

## <u>NOTICE</u>

Notice of this Motion was served via facsimile or electronic mail to (i) the Top 20 Largest Unsecured Creditors, (ii) the Office of the United States Trustee, (iii) counsel for Bank of America, (iv) counsel for the Lawsuit plaintiffs, and (v) the New Mexico Attorney General.


 /s/ Craig H. Averch
Craig H. Averch