**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW MEXICO**

| | |
|---|---|
| In re | |
| OTERO COUNTY HOSPITAL ASSOCIATION, INC. (d/b/a Gerald Champion Regional Medical Center), | Case No. 11-11-13686-___A |
| Debtor. | |

**AFFIDAVIT OF WILLIAM MORGAN HAY IN**
**SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS**

STATE OF NEW MEXICO      )
                                 ) ss.:
COUNTY OF OTERO             )

         I, William Morgan Hay, pursuant to Section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge:

         1.       On August 16, 2011 (the "Petition Date"), Otero County Hospital Association (the "Debtor"), as debtor and debtor in possession, commenced a case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. I am an individual over eighteen (18) years of age and am the Chief Financial Officer of the Debtor. As such, I am familiar with the day-to-day operations, business and financial affairs of the Debtor.

         2.       I submit this affidavit (the "Affidavit") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Bankruptcy Case and in support of the first day motions and applications (collectively, the "First Day Motions"). Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, information provided to me by certain of the Debtor's employees, my review of relevant documents or my opinion based upon my experience, knowledge and

information concerning the operations and financial affairs of the Debtor.  If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit.  I am authorized to submit this Affidavit.

3. This Affidavit is divided into two sections.  Section I provides a brief description of the Debtor's current organizational structure and operations, its current financial condition and the events giving rise to the Bankruptcy Case.  Section II sets forth those facts which are most germane to this Court's determination of the Debtor's First Day Motions and is intended to supplement any other affidavits submitted in direct support of such motions.

## I.
## BACKGROUND AND EVENTS LEADING TO
## THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A. GCRMC's Business

4. GCRMC is a New Mexico non-profit corporation qualified to do business pursuant to section 501(c)(3) of the United States Internal Revenue Code as a public charity.  Its mission is to provide healthcare services and education to the greater-Otero County community.  In fulfilling its mission statement, GCRMC serves a total population of approximately 70,000 people.  Since 1949, GCRMC has provided quality medical care regardless of race, creed, sex, national origin, disability, age, or financial means.  Although payment for services rendered is critical to its operation, GCRMC believes that all individuals should have access to comprehensive, first-class medical services and healthcare education.

### B. The Hospital

5. In accordance with its mission statement, GCRMC developed and operates the Gerald Champion Regional Medical Center (the "Hospital") in Alamogordo, New Mexico.  The Hospital, built in 1999, replaced GCRMC's then-existing facilities, which had been in use since

1949.  The Hospital is the only acute care healthcare facility in Otero County and is over seventy-five miles driving distance from the closest comparable facility.  The Hospital features, among other things, diagnostic imaging services (i.e., MRI, CAT scan, and nuclear medicine), cardiopulmonary services, gero-psych services, inpatient rehabilitation services, an intensive care unit, a maternal child unit, and sleep disorder study capabilities.  It is also designated as a Level III trauma center.  When the new facility opened in 1999, the Hospital received design awards and was recognized as a state-of-the-art community medical facility.

6.      In order to continue to provide first-class medical services, GCRMC is currently in the process of making major improvements to the Hospital, including converting the majority[1] of its double patient rooms to single patient rooms to improve infection control, ease of HIPAA compliance, and the overall patient experience.  In total, the Hospital currently has ninety-nine licensed acute care beds, twelve gero-psychiatric beds, and twelve inpatient rehab beds.

7.      A significant volume of patients make use of the Hospital's facilities each year.  On an average annual basis, the Hospital has approximately 4,400 admissions and 32,000 emergency room visits.  Annually, it is also the site of approximately 600 infant deliveries, 2,100 in-patient surgical procedures and over 7,000 out-patient procedures.  In accordance with its mission to provide healthcare to the entire community, GCRMC provides services through the Hospital to patients covered by limited reimbursement insurers such as Medicaid and the County Indigent Program.  Many uninsured and underinsured patients are covered by GCRMC's charity care policy.  Over the past three years, the average unreimbursed value of charity care provided was approximately $2.2 million per year.

---

[1]      Once this transition is complete, only the gero-psych rooms will remain double patient rooms to facilitate patient socialization.

8.  In connection with the development of the new facility in 1999, GCRMC entered into a sharing agreement with the Department of Defense whereby Air Force physicians from nearby-Holloman Air Force Base are credentialed to admit and treat Department of Defense beneficiaries. The Hospital was among the first civilian healthcare facilities that permitted active duty physicians to practice medicine in a non-Department of Defense facility. This initiative has saved the Department of Defense nearly $5 million annually in operational costs and millions more in Military construction costs.

9.  The Hospital's sizeable staff makes GCRMC Otero County's largest non-governmental employer. GCRMC relies upon a workforce of approximately 704 employees, including approximately 562 full time employees and 142 part time or as-needed employees. On an annualized basis, GCRMC pays approximately $37.7 million in wages and salaries to its employees and an additional approximately $8.6 million in benefits.

## C.  GCRMC's Commitment to Community Healthcare Beyond its Doors

10.  GCRMC's efforts to meet the healthcare needs of its community go well beyond the direct provision of care at the Hospital. In addition to those core healthcare services, GCRMC provides many free or below-cost services throughout the year that GCRMC believes serve a bona fide community health need. For example, GCRMC provides direct support to diabetic, hepatitis C, sign language, Narcotics Anonymous, and cardiac and stroke patient support groups. GCRMC also conducts health fairs and health screening clinics for cholesterol, diabetes, blood pressure and blood type, and seminars in order to foster better health awareness. GCRMC additionally serves as an educational training site for registered nurses, x-ray technologists, medical technologists, physical therapists, emergency medical technicians, and nursing assistants in affiliation with New Mexico State University-Alamogordo, the University

of New Mexico, and other universities, and participates in health fairs in order to foster better health awareness in the community. Finally, GCRMC directly engages in many other health-related community activities, such as Lamaze, breast feeding, new baby and sibling classes, and CPR training to members of the community.

11.     GCRMC's contributions to community health are not limited to direct provision of services. It also partners with Otero County and various localities within Otero County to support and fund the provision of medical services to patient populations with limited access to the Hospital. GCRMC contributes to rural health clinics in Cloudcroft, Tularosa, and Chaparral, and supports medical services at the Otero County Detention Center. Without GCRMC's support, these populations would have significantly less access to healthcare.

12.     GCRMC provides further support, both directly and indirectly, to over thirty community health and wellness programs, such as: The United Way, Relay for Life, and the Boys and Girls Club. GCRMC's non-Hospital community contributions totaled approximately $1.15 million in the year ending June 2011.

13.     Through its numerous facilities, programs, and projects, GCRMC is directly or indirectly responsible for nearly all of Otero County's healthcare infrastructure. It is likely that the decision of every practicing physician in Alamogordo to commence his or her practice there was largely influenced by GCRMC and the presence of the Hospital. In short, GCRMC is the lynchpin of healthcare services in Otero County.

14.     One of GCRMC's most fundamental and critical functions in maintaining Otero County's healthcare infrastructure is its active recruitment of healthcare providers, especially physicians, to meet specifically identified community needs. Over the past two years, GCRMC has been responsible for bringing approximately twenty physicians to the community, including

practitioners of endocrinology, obstetrics and gynecology, family medicine, pediatrics, orthopedics, internal medicine, psychiatry, general surgery, neurology, pathology, cardiology, and nephrology. Offering direct employment to physicians has become an increasingly important practice tool for hospitals throughout the country. As a result, Physicians will often only agree to come to the community if employed directly by GCRMC. Unfortunately, the practice has placed GCRMC at a greater litigation risk because claims against physicians employed directly by GCRMC are not compensable by the patient compensation fund established pursuant to the New Mexico Patient Malpractice Act.

**D.    GCRMC's Management**

15.    Since 1986, GCRMC has contracted the day to day management of the Hospital and its other healthcare services to Quorum Health Resources, LLC ("QHR"). QHR specializes in the management of community hospitals and currently has approximately 150 hospitals under management. Pursuant to GCRMC's current contract with QHR, QHR provides GCRMC with, among other things, highly skilled and experienced managers at the chief executive officer and chief financial officer positions, group purchasing privileges that significantly reduce GCRMC's costs, and access to an array of training opportunities and administrative resources that would not otherwise be available to a hospital of GCRMC's size. QHR has also provided GCRMC with a highly skilled and experienced chief administrative officer to assist management with the additional workload associated with this Chapter 11 Case. The ultimate decision-making authority of GCRMC rests with a board of directors comprised of ten volunteer community leaders.

16.    Prior to its engagement of QHR in 1986, GCRMC suffered from financial weaknesses attributable in large part to its inability to provide the range of services necessary to

fully service the local healthcare market. QHR assisted GCRMC in identifying the facilities and capabilities it lacked which were in-demand within the community. In response, GCRMC, in conjunction with QHR, developed a targeted growth plan, driven by identified community needs, that continues today. Since 1986, under QHR's management, GCRMC's gross revenue has increased substantially, as has the number of medical providers in Otero County. Currently, GCRMC works with over 260 affiliated healthcare providers, including a full complement of subspecialists. The success of GCRMC's expansion efforts is well illustrated by the fact that over 70% of Otero County residents now use the Hospital for their healthcare needs, and approximately 80% of residents in Otero County who undergo inpatient surgical procedures do so at the Hospital.

17.     GCRMC's extraordinary growth during the course of its relationship with QHR reflects its commitment to providing the maximum range of services supportable by a community of Otero County's size. GCRMC has brought quality healthcare closer to home, and improved the overall health and quality of life of the people it serves. As a non-profit corporation, GCRMC's success equates to the community's success, as all profits earned from operations are reinvested in improvements to its facilities, services, and other health-related initiatives. In response to identified community needs, GCRMC is in the final stages of completing a wound care center and transitioning its existing double patient rooms to single patient rooms. On July 1, 2011, GCRMC opened an acute rehabilitation inpatient center.

**E.      Events Giving Rise to the Bankruptcy Filing**

18.     Since June 2010, GCRMC, along with QHR and a number of other defendants, has been subject to an onslaught of personal injury lawsuits stemming from a series of procedures performed at the Hospital (the "Lawsuits") between 2006 and 2008. In total, forty-

seven individuals who underwent such procedures have filed the Lawsuits. Only two physicians, one operating independently and one employed by the Hospital, were involved in some manner with the Lawsuits. Currently, neither of the physicians implicated in the Lawsuits have any affiliation with GCRMC. Although the physicians are no longer with GCRMC, GCRMC's potential exposure in connection with the Lawsuits remains and poses a significant threat to its ability to effectively carry out its mission. As the sole community healthcare provider in Otero County, the pendency of the Lawsuits has affected GCRMC's ability to raise the funds necessary to continue to meet the current and future healthcare needs of the community.

19.     GCRMC disputes the claims asserted in the Lawsuits, but recognizes that it faces significant uncertainty as well as administrative and financial burdens in defending the Lawsuits. Indeed, the Lawsuits have already impacted GCRMC's ability to obtain financing. GCRMC voluntarily filed its Petition with the objective of resolving the Lawsuits in a fair, reasonable, and efficient manner while ensuring its long-term stability for the benefit of the community it serves.

**F.     GCRMC's Capital Structure**

20.     For its current capital/debt structure prior to the Petition Date, GCRMC required capital in order to, among other things, (i) finance and reimburse the costs of constructing and implementing improvements to GCRMC (the "2007 Hospital Improvement Project") and; (ii) refinance existing debt obligations relating primarily to the construction of the Hospital in 1999.

21.     To provide GCRMC the capital necessary to fund construction in 2007 and to refinance preexisting debt, the City of Alamogordo, a political division of the State of New Mexico (the "City") issued (i) $30,465,000 in aggregate principal amount of its Hospital Improvement and Refunding Revenue Bonds (Gerald Champion Regional Medical Center

Project) Series 2007A (the "Series 2007A Bonds"); and (ii) $8,020,000 in aggregate principal amount of its Taxable Hospital Improvement and Refunding Revenue Bonds (Gerald Champion Regional Medical Center Project) Series 2007B (the "Series 2007B Bonds," and, collectively with the Series 2007A Bonds, the "Bonds") pursuant to New Mexico law.

22.     The Bonds are governed by the terms of a trust indenture (the "Trust Indenture") entered into by the City and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Bond Trustee") on or about November 15, 2007.

23.     To establish an income stream to support payments under the Bonds, the City and the Debtor entered into that certain Lease Agreement (the "Lease Agreement") whereby the City leased the Hospital and certain related assets to GCRMC in exchange for lease payments (the "Lease Payments").  Pursuant to the terms of the Lease Agreement, the Debtor is obligated to keep in place at all times a letter of credit for the benefit of bondholders in an amount not less than the sum of all remaining obligations under the Bonds.

24.     To secure the payments under the Bonds, and in accordance with the terms of the Lease Agreement, the Debtor and Bank of America, N.A. (the "Bank") entered into that certain Letter of Credit and Reimbursement Agreement (the "Reimbursement Agreement"), whereby the Bank issued an irrevocable letter of credit in the amount of $38,927,842 in favor of the Trustee (the "Letter of Credit").  The Letter of Credit can be drawn by the Trustee under certain circumstances.  Under the Reimbursement Agreement, the Debtor must reimburse the Bank for any draws on the Letter of Credit.  The Debtor's obligations under the Reimbursement Agreement are secured by that certain Mortgage and Assignment of Rents and Leases, Security Agreement and Financing Statement (the "Mortgage"), recorded on November 15, 2007, granting a mortgage on the Hospital and associated real property and a first priority security

interest in certain personal property used in connection with the Hospital, as evidenced by that certain Security Agreement by and between the Debtor and the Bank (the "Security Agreement").

25.     The Letter of Credit is drawn periodically to make all necessary debt service payments on the Bonds.  As the Letter of Credit is drawn, the payments pursuant to the Lease Agreement are directed to the Bank to cover the draws.

26.     The Letter of Credit expires on November 15, 2012.  The Debtor is unable to secure a replacement letter of credit with the existing Lawsuits pending.  If the Debtor fails to secure either (i) an extension to the Letter of Credit, or (ii) a replacement letter of credit by October 1, 2012, the Trustee is obligated to tender the Bonds for Redemption on November 10, 2012.  Such a tender would cause the Letter of Credit to be drawn and result in the Debtor owing all amounts paid under the Letter of Credit to Bank of America pursuant to the Reimbursement Agreement.  Put another way, the liabilities owed under the bonds would be, in effect, accelerated if the Letter of Credit cannot be extended or replaced.

27.     As of June 30, 2011, the current amounts outstanding under the Bonds were approximately $30.5 million in respect of the Series 2007A Bonds and approximately $6.5 million in respect of the Series 2007B Bonds.  As of June 30, 2011, the book value of the Debtor's current assets was approximately $32.1 million and the book value of the Debtor's current liabilities, exclusive of the Lawsuits, was approximately $20.2 million.  In November 2011, without any prospect of replacing or extending the Letter of Credit, the Debtor's current liabilities will jump to approximately $57.1 million.  Without any ability to extend or replace the Letter of Credit, the Debtor will be unable to satisfy its current liabilities out of its current assets. This could have a significant impact on the Debtor's operations.

28.    In order to avoid this eventuality, the Debtor commenced this Chapter 11 Case to provide a framework for the fair and expeditious resolution of the Lawsuits.  Once the Lawsuits are resolved, the Debtor expects to have renewed access to capital markets, permitting it to extend or refinance the Letter of Credit and refocus its attention on fulfilling its mission to provide quality healthcare services to its community.

## II.

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

29.    Concurrently with the filing of the Petition, the Debtor has filed the First Day Motions.  The Debtor requests that the relief requested in each of the First Day Motions described below be granted, as each request for relief constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtor for the benefit of all parties in interest.

**A.    Debtor's Request for Emergency Consideration of Certain First Day Motions**

30.    The Debtor wishes to address certain issues on an emergency basis in order to minimize the impact of its petition filing on its operations, central to which are the confidence and morale of its employees.  The Debtor respectfully requests a hearing on the following motions on an emergency basis at the Court's earliest convenience.

**i.    Debtor's Motion for Order (i) Authorizing Continued Use of Existing Bank Accounts; (ii) Waiving Investment and Deposit Requirements; and (iii) Granting Certain Related Relief**

31.    Requiring the Debtor to close all bank accounts and open new bank accounts would cause the Debtor to suffer severe business disruptions due to an inability to immediately satisfy postpetition debts and any prepetition debts authorized by this Court.  Furthermore,

closing and reopening bank accounts would impose a significant burden on the Debtor's

managerial resources, and, potentially disrupt patient services.

### ii. Debtor's Motion for Authority to Pay Prepetition Wages, Compensation, and Employee Benefits (the "Employee Motion")

32.     Without the ability to provide employees with their wages and benefits in the

ordinary course of the Debtor's business, employee confidence in the Debtor could be destroyed

and employee morale would suffer.  Additionally, there would be a greater risk that employees

may leave the employment of the Debtor for other opportunities.

### iii. Debtor's Motion for Authority to (i) Honor and Maintain Certain Employment Agreements; (ii) Pay Certain Prepetition Wages, and Other Agreed Compensation; and (iii) Honor Additional Related Contractual Benefits as to Certain Medical Providers (the "Medical Providers Motion")

33.     Without the relief requested in the Medical Providers Motion, the same adverse

consequences described with respect to employees in connection with the Employee Motion,

above, would likely also come to pass with respect to the Debtor's medical providers.  Moreover,

the Debtor's medical providers possess unique and in-demand skills which offer them a high

degree of mobility.  Any disruption in the payment of obligations to which these medical

providers are entitled may cause them to consider alternate employment opportunities.  The

Debtor has invested heavily in recruiting and retaining its medical providers.  Any threat to the

goodwill between the Debtor and its medical providers has the potential to adversely impact the

value of that investment.

### iv. Debtor's Motion for an Interim and Final Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service to the Debtor; (ii) Deeming Utility Companies Adequately Assured Of Future Payment; and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance

34.     The Debtor would be unable to care for the patients under its care or otherwise operate without utilities services.

**v.      Debtor's Motion for Entry of an Order (i) Authorizing Debtor to (a) Maintain Insurance Programs, (b) Maintain Insurance Premium Financing Programs, (c) Pay Insurance Premiums in the Ordinary Course and (d) Pay all Obligations Associated Therewith; and (ii) Preventing Insurance Companies From Giving Any Notice of Termination or Otherwise Modifying any Insurance Policy Without Obtaining Relief from the Automatic Stay**

35.     Without the authority to maintain its Insurance Programs and Insurance Premium Financing Programs the Debtor's insurance policies and coverage may be adversely affected.

**vi.     Debtor's Motion for Entry of an Order Authorizing (i) Payment of Certain Ordinary Course Patient Overpayments; and (ii) Turnover of Certain Third-Party Payor Funds**

36.     The inability to reimburse patient or third party payor overpayments or apply third party funds for their intended purposes could have an adverse effect on the Debtor's relationship with its patients and those insurers that provide a significant portion of its revenue. Loss of patient trust and confidence could have a significant effect on future utilization of the Hospital by existing patients, and third party payors, such as commercial insurers, may revisit their payment and reimbursement policies with respect to the Hospital. Either of these eventualities would have a significant adverse impact on the Debtor's business.

**vii.    Debtor's Motion for Authority to Make Postpetition Payments on Account of Prepetition Claims of Medicare and Medicaid and Permit Deductions for Overpayments in the Ordinary Course of Business**

37.     Absent the ability to make postpetition payments on account of prepetition claims of Medicare and Medicaid and permit deductions for overpayments in the ordinary course of business, the Debtor may be subject to audits and even termination of its rights to participate in services provided by the Department of Health and Human Services, specifically Medicare and Medicaid. In the previous fiscal year, the Debtor derived over 62% of its revenue from Medicare

and Medicaid reimbursements.  If this revenue stream were cutoff or disrupted during the Debtor's reorganization process, the Debtor would not be able to continue to provide critical healthcare services to the people of Otero and its neighboring counties.

> **viii.** **Debtor's Motion Pursuant to 11 U.S.C. §§ 105, 361, and 363 and Bankruptcy Rule 4001(D) of the Federal Rules of Bankruptcy Procedure for Entry of the Stipulation (i) Authorizing the Use of Cash Collateral; (ii) Granting Adequate Protection to Bank Of America, N.A.; and (iii) Granting Related Relief**

38.     Absent entry of the stipulation authorizing the use of Cash Collateral and granting adequate protection to Bank of America, Bank of America would have the power to fund the letter of credit issued to guarantee the bond payments resulting in an acceleration of the entire outstanding amount of the bonds issued to finance the Debtor's expansion of the Hospital.  This would convert the Debtor's long-term obligations to immediately due and payable obligations secured by the majority of the Debtor's assets.  The immediate funding of the letter of credit would cause immediate and irreparable harm to the Debtor's estate and creditors because it would pose a significant threat to the Debtor's ability to maintain its current operations.

> **ix.** **Debtor's Motion for Authority to Pay Prepetition Trust Fund Taxes in the Ordinary Course of Business**

39.     The consequences of the Debtor's failure to turn over funds it has collected from its patients and other customers to the applicable taxing authorities may include personal liability on the parts of the Debtor's officers and directors.

**B.     Debtor's Emergency Motion for Order (I) Authorizing Continued Use Of Existing Bank Accounts; (II) Waiving Investment and Deposit Requirements; And (III) Granting Certain Related Relief (the "<u>Cash Management Motion</u>")**

40.     The Debtor has a variety of financial accounts (the "<u>Existing Accounts</u>") that it wishes to maintain during the pendency of the Bankruptcy Case.  The Existing Accounts are comprised primarily of three operating accounts.  In addition, it includes two deposit accounts

and several certificates of deposit held with a variety of local institutions, investment accounts, a reserve account held pursuant to the Trust Indenture, and several small petty cash accounts at various locations within the Hospital and clinics as necessary to conduct its business.

41.     The operating accounts are as listed on Exhibit A to the Cash Management Motion (the "Bank Accounts").  Further included on Exhibit A to the Cash Management Motion is a graphic chart describing deposits, disbursements, and inter-account transfers generally associated with each Bank Account.  The Bank Accounts are each maintained at stable, Federal Deposit Insurance Corporation ("FDIC") insured financial institutions.  The checking account ending in –9705 is the Debtor's primary operating account (the "Operating Account") and is maintained at Wells Fargo Bank, N.A., an authorized depository recognized by the U.S. Trustee. The Debtor also maintains a savings account ending in –4908 (the "Savings Account") at the same institution.  The Debtor transfers funds between the Operating Account and the Savings Account as necessary to maintain sufficient funds to pay disbursements while maximizing interest earned on its operating funds.  Additionally, the Debtor maintains the account ending in –3401 (the "Physician Transfer Account") at First National Bank in Alamogordo into which certain cash receipts from physician practices are deposited.  First National Bank in Alamogordo is a member of the FDIC and is consistently rated as one of the safest, most secure and best performing banks in the United States by both Veribanc, Inc. and Bauer Financial Reports, Inc. The deposits made into the Physician Transfer Account are from time to time transferred into the Operating Account.  The Debtor also maintains small cash accounts with the Otero Federal Credit Union.

42.     The Wells Fargo account ending in -9705 is a non-interest bearing account covered under the Dodd-Frank Deposit Insurance Provision.

43.     To generate additional interest income not available for funds held in standard checking or savings accounts, the Debtor periodically purchases certificates of deposit (the "Certificates of Deposit") at local and national financial institutions that are insured by the FDIC. A list of the Debtor's current Certificates of Deposit is attached to the Cash Management Motion as Exhibit B.  If the Debtor were to withdraw funds held in the Certificates of Deposit prior to their respective maturity dates, it would suffer early withdrawal penalties.  The Debtor additionally maintains a Merrill Lynch money market account (the "Money Market Account"), as described on Exhibit C to the Cash Management Order, in order to maintain liquidity while earning higher returns than those available from an ordinary savings account.

44.     To comply with the Reimbursement Agreement, the Debtor makes monthly deposits to a sinking fund account which it maintains at Bank of America (the "Sinking Fund Account").  This account is identified in Exhibit D, attached to the Cash Management Motion. Closing or moving this account would violate the terms of the Reimbursement Agreement. Indeed, pursuant to the Reimbursement Agreement, the Debtor lacks authority even to withdraw funds from the Sinking Fund Account.

45.     To generate additional returns on its capital, to protect against inflation risks, and to meet future community health needs, the Debtor also maintains certain investment accounts (the "Investment Accounts"), which are held by the Debtor with various investment managers (the "Investment Managers").  A list of the Investment Accounts is attached to the Cash Management Motion as Exhibit E.  The current aggregate market value of the Investment Accounts is approximately $16 million.  The investments are managed with the objective of minimizing risk while maintaining a reserve to permit the Debtor to periodically improve and/or replace its property, plant, and equipment.  All of the approximately $16 million (in current

market value) of securities held in the Investment Accounts can be liquidated on three-days' notice (save and except less than 10% of the portfolio which may take a few weeks to liquidate fully).

46.     Finally, the Debtor uses cash in the ordinary course of its business as necessary to consummate small sales transactions with its patients and other customers (i.e. accept payment and make change), to fund minor purchases and to provide employees with reimbursements for personal outlays in amounts less than $25.  In total, at all times, the Debtor holds no more than approximately $10,000 in total petty cash, and no more than $2,000 in any one location.  The use of petty cash is governed by a written policy which sets forth among other things, restrictions on use, audit and security protocols relating to petty cash.  For security reasons, the amounts and locations of the petty cash accounts (the "Petty Cash Accounts") are not attached hereto.

47.     Disbursements from the Debtor's various accounts are made, depending upon the circumstances, by numbered check, ACH transfer, wire transfer, or by other means.  Notably, the Debtor handles all payroll disbursements in-house and makes the vast majority of its payroll disbursements by ACH transfer.[2]  This method of making payroll disbursements is superior to disbursement by physical checks in terms of cost, speed and convenience.  It is my understanding that the Debtor's employees, the vast majority of whom have voluntarily enrolled in the Debtor's direct deposit program, prefer direct deposit payments to physical checks.

48.     If the Court grants the relief requested in the Cash Management Motion, the Debtor intends to continue to maintain strict accounting records so that the United States Trustee and parties in interest may readily monitor the Debtor's financial activity.

---

[2] As of the Petition Date, all but one of its Employees receives payment via ACH transfer.

49.     Moreover, pursuant to agreement with the United States Trustee, the Debtor has agreed to (i) provide the United States Trustee with copies of monthly statements for all of its Accounts; (ii) account in monthly operating reports for all transfers by the Debtor from all of the Accounts to non-Debtor entities, including affiliated entities; (iii) account in monthly operating reports for all inter-Account transfers, including post-petition balances, in any; (iv) list, by account number, in monthly operating reports all month end book balances for all of the Accounts, with an attestation that each account has been reconciled; (v) provide the United States Trustee with the Debtor's most recent form 941 quarterly payroll returns and on an ongoing monthly basis with its monthly operating reports; and (vi) provide the United States Trustee with a chart of all Bank Accounts, in the event that the chart of Bank Accounts with Exhibit A to the Cash Management Motion becomes inaccurate.

50.     All of the Debtor's other deposit and investment accounts are prudent, consistent with reasonable business practices, and designed to yield the maximum reasonable net return on the funds invested given the level of risk associated with each such account.  The Money Market account is maintained with a reputable national bank, and liquidating the Certificate of Deposits prior to their maturity dates would result in breakage fees and other penalties, frustrating the purposes of opening such accounts in the first place.  The Investment Accounts are maintained pursuant to a written policy setting forth the Debtor's objectives of increasing the purchasing power of its assets after inflation to permit the Debtor to periodically improve and/or replace its property, plant, and equipment.  The Investment Accounts are managed by experienced investment managers subject to allocation guidelines with reallocation to conform to such guidelines occurring periodically.  The performance of the Investment Accounts over the life of such accounts demonstrates the success of their managers in preserving overall account value.

The Debtor submits that maintaining the Investment Accounts to permit it to meet its obligations to the community and its creditors is prudent business practice.

## C.      Employee Motion

51.      GCRMC employs approximately 704 employees.  Of these employees, approximately twenty-four are physicians, certified nurse midwives, and certified nurse practitioners directly employed by GCRMC.  Approximately fifty-six of GCRMC's employees are classified as managers or directors (the "Managers/Directors").  The Managers/Directors are salaried employees.  With only a few exceptions, GCRMC's other employees are paid hourly. Among those paid hourly, approximately 130 are full- or part-time nurses (the "Nurses") employed pursuant to the terms of a collective bargaining agreement.  The remaining hourly workers are comprised of various administrative, clinical and support employees (the "Rank and File Employees," and, collectively with the Managers/Directors and the Nurses, the "Permanent Employees").[3]  The Permanent Employees receive benefits in addition to their wages or salaries in their compensation packages.

52.      Also, from time to time, GCRMC employs *pro re nata* employees to fill essential staffing needs—predominantly nurses—on an as-needed basis (the "PRN Employees," and, together with the Permanent Employees, the "Employees").  The PRN Employees receive only wages and no benefits in compensation for their services, except for those PRN Employees that exceed a specified threshold of hours and are therefore entitled to participate in the 401(k) Plan (as defined below).  In addition to their normal hourly rates, the Nurses, the Rank and File Employees, and the PRN Employees are eligible for overtime premiums.

---

[3]      Additional relief with respect to the Employee Medical Providers is requested in the Medical Providers Motion, filed concurrently herewith.

### i. Wages, Salaries and Other Compensation

### Payroll Obligations

53.     To maintain the integrity of its operations, GCRMC requests authority to honor

all outstanding payroll obligations to its Employees.  Typically, GCRMC pays the Employees bi-

weekly in arrears, with a Saturday payroll close date and a Friday pay date.  On a bi-weekly

basis, GCRMC's payroll averages approximately $1.34 million in the aggregate.  Certain

Employees may also receive premium pay in addition to their normal salary or hourly rates.

Employee salary, hourly wages, overtime pay, and premium pay, as applicable, are included in

the bi-weekly payroll.

54.     In contemplation of the commencement of this Bankruptcy Case, the management

of GCRMC determined that it would be prudent to pay Employees prior to the Petition Date to

minimize the risk of disruption to its payroll as a result of the filing and to signal to Employees

that GCRMC has the financial ability to satisfy its obligations to those Employees.  Accordingly,

GCRMC paid a special payroll for the period ending August 13, 2011 (ordinarily scheduled for

disbursement on August 19, 2011) on August 15, 2011.  Since its Employees have been paid for

their services through August 13, 2011, I estimate that approximately $150,000 has accrued but

is not yet due to Employees until the next pay date, with no single Employee having accrued

compensation sought to be paid pursuant to the above-named motion in excess of $11,725.

### Paid Time Off and Sick Leave

55.     In addition to wages and salary, the Permanent Employees accrue paid time off

("Paid Leave"), which varies based on length of service and Employee type (i.e., whether an

Employee is full-time or part-time).  Permanent Employees also accrue paid sick leave ("Paid

Sick Leave," and, collectively with Paid Leave, "Paid Time Off").  Paid Time Off is accrued and

may be redeemed pursuant to written policies (the "Paid Time Off Policies").  Most Employees

are eligible to take Paid Leave beginning six-months after date of hire.  Manager/Directors,

however, are eligible to take Paid Leave from date of hire.  All Employees are eligible to take

Paid Sick Leave beginning three months after date of hire.

      56.     Employees may cash out up to sixty hours of accrued Paid Leave annually ("Paid

Leave Buyback").  If an Employee has accrued the maximum allowable amount of Paid Sick

Leave, as a result of using less than the annual allotment of Paid Sick Leave, at the Employee's

request GCRMC buys back the time above the maximum allowable amount at such Employee's

ordinary rates each December (the "Paid Sick Leave Buyback," and, collectively with the Paid

Leave Buyback, the "Ordinary Course Paid Time Off Buyback").  Upon the termination of its

employment relationship with GCRMC, other than termination of the Employee for cause, an

Employee is paid its accrued but unused Paid Leave in a lump sum (the "Termination Paid Leave

Buyback") and unused Paid Sick Leave[4] ("Termination Sick Leave Buyback," and, collectively

with the Termination Paid Leave Buyback, the "Termination Paid Time Off Buyback," and

collectively with the Ordinary Course Paid Time Off Buyback, the "Paid Time Off Buyback").

For the twelve-month period ending December 2010, the value of Paid Time Off cashed in by

Employees and Employee Medical Providers pursuant to the various Paid Time Off Buyback

programs was approximately $570,000.[5]  As of the Petition Date, GCRMC estimates that the

---

[4]      With respect to Paid Time Off accumulated as a result of accrued but unused sick leave, an employee may only cash out half of such accrued but unused sick time as Termination Sick Leave Buyback, and then only in the maximum amount of 48 hours.

[5]      Total Paid Time Off Buyback in 2010 was comprised of the following amounts: $206, 379 Paid Leave Buyback; $114,764.66 Sick Leave Buyback; $198,639 Termination Paid Leave Buyback; and $52,016 Termination Sick Leave Buyback.

total value of accumulated but unpaid Paid Time Off for the Employees is approximately $2.2 million.

### ii.     Employee Benefits

57.     In the ordinary course of its business, as is customary for companies of its size, GCRMC has established various employee benefit programs, available only to the Permanent Employees, that include medical, dental, prescription drug, disability insurance, life insurance, 401(k) retirement benefits, educational assistance, discounts for services performed at the Hospital, and other similar benefits (collectively, the "Employee Benefits").[6]  The Employee Benefits are generally described below.  The benefits generally available to all Employees, subject to eligibility requirements, are incorporated by reference into GCRMC's collective bargaining agreement with the Nurses.

### Medical, Dental, and Vision Insurance

58.     Medical, dental, vision, and similar insurance programs are central features of the Employee Benefits.  GCRMC maintains premium-based insurance programs providing these coverages, as further described below.  GCRMC is current on all payments under such programs; however, to the extent that any premiums remain unpaid as of the Petition Date or any portion of the current month's payment may be characterized as a prepetition obligation, GCRMC requests authority to pay such amounts.

59.     GCRMC's employee medical insurance program, including prescription drug coverage, is administered by BlueCross BlueShield.  The monthly cost of the medical insurance

---

[6]     The benefits described in the "Employee Benefits" section, are the same or similar to the benefits received by the Employee Medical Providers, as further described in the Medical Provider Motion.  To assist Court's understanding of GCRMC's obligations to the Employees and Employee Medical Providers, GCRMC provides cost estimates of such benefits or amounts owed either to the Employee or the Employee Medical Providers, or a third party.  Where approximated amounts include amounts for both the Employees and the Employee Medical Providers, such will be specified.  Likewise, where approximated amounts only apply to the Employees, such will be specified.

program to GCRMC for both Employees and Employee Medical Providers is approximately $389,000.

60.     GCRMC's employee dental insurance plan is administered by Assurance at a monthly cost to GCRMC for both Employees and Employee Medical Providers of approximately $2,900. GCRMC's employee vision insurance plan is administered as part of the dental insurance plan at no additional cost to GCRMC. The cost sharing with employees for GCRMC's health, dental, and vision plans is uniform across all classes of Permanent Employees. In addition to their various health-related insurance benefits, the Permanent Employees are entitled to discounts on Hospital services in the event that they or an immediate family member requires Hospital care. All Permanent Employees, whether participating in GCRMC's medical insurance program or not, receive a discount on inpatient admissions and outpatient surgeries.

### Life and Disability Insurance

61.     GCRMC maintains certain premium-based life and disability insurance plans, as further described below. GCRMC is current on payments for all related premiums; however, to the extent that any premiums remain unpaid as of the Petition Date, or any portion of the current month's payment may be characterized as a prepetition obligation, GCRMC requests authority to pay such amounts.

62.     GCRMC provides all of its Permanent Employees with fully-funded life insurance administered by Anthem Life. Employees may opt to purchase additional coverage from Symetra Financial and have the premium deducted from their payroll. The monthly cost to GCRMC of its employee life insurance program is approximately $6,000 for both Employees and Employee Medical Providers.

63.     GCRMC also provides long-term disability coverage to its eligible Permanent Employees at no cost to them.  The long-term disability coverage is administered by Jefferson Pilot Financial, at an approximate monthly cost to GCRMC of $9,000 for both Permanent Employees and Employee Medical Providers.

## Workers' Compensation

64.     GCRMC maintains workers' compensation policies to cover injuries sustained by its employees during the policy year.  The annual premium for 2011 on such policies is approximately $444,000 ($37,000 monthly),[7] which policies cover both Employees and Employee Medical Providers.  Besides the premium, GCRMC does not have other liability associated with the workers' compensation policies.

## Educational Assistance

65.     Under certain circumstances and subject to limitations, GCRMC provides financial assistance to Permanent Employees pursuing coursework and/or attending workshops relevant to healthcare and hospital management (the "Educational Assistance").  To ensure that GCRMC benefits from the Educational Assistance payments, such payments are generally subject to recovery by GCRMC if the Employee separates from GCRMC within twelve months of receipt of such payments.  On average, in the twelve months preceding the Petition Date, GCRMC has spent less than $20,000 per month on Educational Assistance.  GCRMC is current on prepetition amounts owing for Educational Assistance.

### iii.     Retirement and Unemployment Benefits

#### 401(k) Contributions

---

[7]     Concurrently herewith, GCRMC has filed a motion seeking to pay any and all premiums associated with its insurance policies, including its workers' compensation policies.

66.     GCRMC maintains a 401(k) plan for all eligible[8] Permanent Employees (the "401(k) Plan"). In general, GCRMC contributes 5% of annual gross pay of eligible Employees (the "401(k) Contributions"). GCRMC pays an additional 5% of an Employee's gross annual pay that exceeds the cap for Social Security contributions. In addition to the contributions made by GCRMC, Employees are permitted (but not required) to contribute an additional amount up to the applicable federal limits to the 401(k) Plan. Employees become vested in the 401(k) Plan at a rate of 20% per year upon the conclusion of their second year of eligibility such that they become fully vested upon the conclusion of their sixth year of eligibility. I estimate that, as of the Petition Date, approximately $550,000 in 401(k) Contributions to Employee accounts have accrued but have not yet been contributed to the 401(k) Plan. Accruals to the 401(k) Plan date back no further than January 1, 2011. I estimate that the value of these unpaid contributions which accrued prior to the date 180 days prior to the petition date is less than $110,000. The Employee Medical Providers receive the same benefits under the 401(k) Plan as do the Employees. In total, approximately 575 of GCRMC's employees are entitled to participate in the 401(k) Plan, including the Employee Medical Providers. The total accrual since January 1, 2011 for all Employees and Employee Medical Providers is approximately $720,000. On an average per-participant basis, the total accrued 401(k) Contributions is approximately $1,250.

**Social Security**

67.     Social Security is an important part of every Employee's retirement benefits. GCRMC makes a matching contribution to each of its Employees' Social Security taxes and Medicare taxes (collectively, the "SS Matching Obligations," and, together with the 401(k) Contributions, the "Retirement Obligations"). In the twelve months preceding the Petition Date,

---

[8]     Employees that work more than 1,000 hours per year are eligible to participate in the 401(k) Plan.

GCRMC spent an average of approximately $200,000 per month for both Employees and Employee Medical Providers in SS Matching Obligations.

## Unemployment Compensation

68.     Each year, GCRMC contributes to the New Mexico Unemployment Insurance Compensation and Trust Funds on behalf of its Employees (the "Unemployment Obligations").  I estimate that GCRMC's total contribution in 2011 will be approximately $200,000 for both Employees and Employee Medical Providers.  As of the Petition Date, no Unemployment Obligations have accrued but have not yet been paid.

69.     It is essential for the morale and maintenance of trust of the Employees that necessary steps are taken to protect the Employees' retirement and unemployment benefits.  As such, GCRMC seeks authority to pay all Unemployment Obligations and Retirement Obligations, notwithstanding that portions of such obligations may be considered payment of prepetition claims.

## Severance Benefits

70.     From time to time GCRMC enters into severance agreements, on an *ad hoc* basis with its Employees, depending upon the circumstances of the Employee's separation from GCRMC.  Such agreements invariably contain general releases resolving all existing claims or potential claims between the severed Employee and GCRMC.  GCRMC currently has outstanding obligations under one such severance agreement (the "Severance Agreement") which obligations are set to conclude in early October of 2011.  The Severance Agreement contains a general release in favor of GCRMC and, as of the Petition Date, GCRMC has fulfilled a significant portion of its obligations under the Severance Agreement.  As of the Petition Date, GCRMC's remaining obligations under the Severance Agreement total approximately $32,000.

GCRMC seeks authorization to fulfill its remaining obligations under the Severance Agreement in the ordinary course of its business.

**Miscellaneous Employee Benefits**

71.     In the ordinary course of its business, GCRMC provides its Employees with certain bonuses, gifts, and awards to foster employee morale and loyalty.  I believe that these programs contribute to staff morale and collegiality.  Holiday and performance bonuses in 2010 totaled approximately $400,000, and other gifts and awards (such as "Employee of the Month" awards) totaled approximately $9,000.  These bonus and award programs are a longstanding tradition of GCRMC and an important part of Employee compensation.  I believe that these benefits are necessary to maintain employee morale and that Employee's consider these benefits to be an important part of their compensation.  Because of the benefits GCRMC derives from these programs in terms of Employee morale, GCRMC intends to continue to provide such benefits post-petition.  The total value of prepetition bonuses that have accrued but not been paid as of the Petition Date (the "Prepetition Bonuses") is $150,000.  I cannot state with certainty the pro-rata share of the Prepetition Bonuses to which each Employee is entitled.  However, I do not believe that any single Employee will be entitled a Prepetition Bonus in excess of $5,000.

72.     GCRMC further provides certain Employees with a credit card (the "Employee Credit Cards"), each such card bearing the name of the Employee authorized to use such card. The Employee Credit Cards are used for authorized business expenses and paid for by GCRMC. The Employee Credit Cards benefit the Employees by providing a convenient means by which to satisfy business needs without making a personal outlay of cash or extension of credit on behalf of GCRMC.  I believe that if the Employee Credit Cards are unpaid, the issuer of such cards will refuse to permit GCRMC and its Employees to use such cards postpetition and may refuse to

extend new cards to GCRMC postpetition.  I believe that paying any balance on the Employee

Credit Cards account, regardless of when such obligation arose, would help to ensure the

availability of credit from the issuer of such cards postpetition.  Moreover, I believe that any

prepetition balance that may exist on the account associated with the Employee Credit Cards will

be less than the administrative cost of securing a new source of postpetition credit.

### iv.      Employee Reimbursements

73.      In the ordinary course of business, GCRMC reimburses its Employees for cash

outlays they may from time to time be required to make on behalf of GCRMC (each such act of

reimbursement, an "Employee Reimbursement").  At any given time, an Employee may be

holding a reimbursable receipt for a business expense, and GCRMC has no way of knowing

which of its approximately 700 Employees may have been obligated to make a purchase on

behalf of GCRMC that has not yet been reimbursed.  It is likely that such is the case as of the

Petition Date.  By this Motion, GCRMC requests authorization to pay any Employee entitled to a

reimbursement for a purchase that it made on behalf of GCRMC in the ordinary course of its

business.

### v.       Administrative Service Providers

74.      As is customary for companies of its size, GCRMC uses third parties to

administer employee benefit plans (the "Administrative Service Providers").  Specifically,

GCRMC uses PayFlex to administer its Flexible Spending Account Plans (as defined below) and

Lincoln Financial for its long term disability plan.  I believe that the continued support of the

Administrative Service Providers is crucial to GCRMC's ability to maintain accurate and

meaningful books and records reflecting GCRMC's employee benefit obligations.  I believe that

GCRMC is current with respect to amounts owing to Administrative Service Providers; however,

to the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, GCRMC requests authority to pay such amounts.

### vi. Miscellaneous Withholdings from Employee Pay

75.     GCRMC deducts certain amounts from its Employees' pay for the payment of the Employee portion of medical and other welfare insurance premiums, flexible spending account plans (the "Flexible Spending Account Plans") that provide for withholdings on a pre-tax basis of certain medical and related expenses, 401(k) Plan deductions, and other miscellaneous amounts (collectively, the "Voluntary Employee Deductions").

76.     GCRMC is also in possession of various withholdings, such as payroll taxes, social security, Medicare, unemployment, garnishments, child support payments, etc. (together with the Voluntary Employee Deductions, the "Deductions").  As of the Petition Date, funds have been deducted from Employee wages but have not yet been forwarded to the appropriate third-party recipients.  GCRMC seeks authority to forward the Deductions to the appropriate parties.  Without such authority, I understand that GCRMC's officers and directors may be subject to personal liability.  I believe that this would create a substantial distraction to those individuals at a critical juncture in GCRMC's operations and restructuring efforts.

### vii. The Collective Bargaining Agreement

77.     As noted above, GCRMC is party to a collective bargaining agreement (the "CBA") with the Carpenters Industrial Council, United Brotherhood of Carpenters and Joiners of America, Professional Performance Committee, Local Union #2088.  The CBA sets forth with great detail the terms and conditions of GCRMC's employment relationship with the Nurses. The CBA generally provides the same benefits available to GCRMC's non-union Employees, as well as certain additional benefits.  I believe that there could be significant disruptions to

GCRMC's business if GCRMC failed to honor its obligations under the CBA in the ordinary course of its business.

78.     Maintaining good relations with Employees is critical to the value of GCRMC's estate because its Employees, many of whom have been with GCRMC for years, are the most important component of GCRMC's ability to operate the Hospital.  Accordingly, I believe that all parties in interest will benefit from the payment of the Emergency Prepetition Employee Obligations in the ordinary course of business because they are necessary to preserve the Debtor's operations and the value of the Debtor's estate.  Based on my experience in management and close working relationships with many of the Employees, I believe that honoring the Employee obligations when due will encourage Employees to remain in GCRMC's employ.  On the other hand, I believe that Employees would consider alternative employment opportunities if they came to view GCRMC as an unreliable source of income for them and their families.  I also believe that many Employees would suffer significant personal hardship if all Employee benefits are not timely paid.  GCRMC has always paid Employee obligations on time and Employees should reasonably expect to be timely paid in the future.

79.     Furthermore, I believe that the failure of GCRMC to forward the Deductions to the appropriate third parties when due would cause hardship to its Employees and third parties alike.  In some instances, certain legal obligations of Employees are fulfilled when GCRMC forwards Deductions to third parties, and Employee could face legal action if such Deductions are not properly forwarded.

80.     Concerning the Paid Time Off Buyback Programs, I am aware that the Employees consider these benefits an essential component of their compensation package.  Paid Sick Leave Buyback is paid during the holiday season, providing Employees with an infusion of cash when

many need it most, and Paid Leave Buyback is paid at the request of the Employee, providing Employees with an important safety net for unexpected expenses. Upon retirement, many Employees leave with a substantial sum as a result of the Termination Paid Time Off Buyback that may be used to transition from working life to retirement. Employees are aware of the value of these safety nets and I believe that the comfort and confidence provided by this benefit contributes significant to Employee morale and satisfaction. This, in turn benefits GCRMC's patients, and, ultimately, GCRMC's mission and financial condition.

81. Concerning the Severance Agreement, I believe that Employee morale would be adversely affected if Employees were to learn that GCRMC failed to honor its obligations to a former colleague of the Employees. Moreover, GCRMC's obligations owing under the Severance Agreement are relatively small in comparison to the Debtor's overall assets. In contrast, I believe that the cost of revisiting the issues resolved by the Severance Agreement would be significant in comparison the outstanding balance on the Severance Agreement.

82. For all of the reasons stated above, I believe that honoring all pre- and post-petition obligations to the Employees is in the best interests of GCRMC, its estate, its creditors, and all other parties in interest, including the community to which GCRMC provides essential healthcare services.

**D. Medical Providers Motion**

83. The Hospital is the sole acute-care provider in Otero County, serving a population of approximately 70,000. Besides offering a full range of healthcare services to residents in Otero and neighboring counties directly through the Hospital, GCRMC also serves the community by attracting and retaining top physicians and allied health professionals, such as certified nurse midwives and certified nurse practitioners (collectively, and including the

Employee Medical Providers (as defined below), the "Medical Providers," each a "Medical Provider"). In fact, in addition to the Employee Medical Providers who are directly employed by GCRMC, there are currently over 50 Medical Providers in the community many of whom were recruited and retained by GCRMC. Such recruitment, however, is more difficult in Otero County than larger, metropolitan cities. Without GCRMC's active recruitment and retention programs, the local community would have insufficient Medical Providers to serve the community's medical needs, and patients would have to travel significant distances to receive certain types of specialized medical care. Because of the difficulty and expense of recruiting Medical Providers, even the loss of a single Medical Provider can result in a significant decrease in the level of care available to the community, particularly in single specialties such as ENT, Nephrology, Endocrinology, and Urology, among others. Further, as it is difficult and expensive to recruit Medical Providers to Otero County under optimal circumstances (it takes between 9-24 months to recruit a new Medical Provider), it will be even more difficult during a chapter 11 reorganization. Thus, it is absolutely critical for GCRMC to maintain its current relationships with its Medical Providers.

84. To memorialize the terms of its recruitment of a Medical Provider, GCRMC may, but is not required to, enter into one of the following: Employment Agreements, Income Guarantees, On-Call Agreements, and Medical Director Agreements (all as defined below) (collectively, the "Medical Provider Agreements").[9]

---

[9] Under certain circumstances, GCRMC may enter into one or more of the Medical Provider Agreements with a Medical Provider, depending on the terms of the recruitment.

### i. Employee Medical Providers

85.     One of GCRMC's missions is to develop a base of Medical Providers to increase access to primary care and specialty services in the community.  It is often difficult to recruit Medical Providers to work in the Hospital and in the broader community.  For this reason, GCRMC not only recruits Medical Providers to be employed at its facilities, but also provides an invaluable service to the community by recruiting independent Medical Providers to open local offices and work in local clinics by entering into Income Guarantees with such Medical Providers.

86.     Under certain circumstances, GCRMC has determined that the community would be best served by hiring a physician to provide medical services in the Hospital or at a Practice Site (as defined below).  Such physicians enter into Physician Employment Agreements (the "Physician Employment Agreements"), pursuant to which, the physician becomes a direct employee of GCRMC (the "Employee Physicians").  Under the Physician Employment Agreements, the Employee Physicians provide certain healthcare services in the Hospital or at their own off-site offices (each, a "Practice Site"), including, among other things, delivering primary and specialty care services to patients, providing full or part-time physician coverage, assisting the Hospital and the Hospital's administration in overseeing compliance with applicable policies, and coordinating medical care rendered at the Hospital or a Practice Site.  In return, GCRMC agrees to, among other things, provide the Employee Physicians use of the Hospital and/or a Practice Site, provide professional liability insurance covering the Employee Physicians, pay the Employee Physicians a base salary plus incentive compensation and additional individualized compensation or incentives, including retention incentive payments, provide

certain benefits to the Employee Physicians and/or pay rent and expenses associated with a Practice Site.

87.     In certain instances, the Employee Physicians' duties include serving as director of a particular practice in which case, the Employee Physicians would receive additional compensation for providing certain administrative services, including, but not limited to, managing the department, developing, implementing and maintaining departmental quality assurance and review programs, and conducting an annual performance review of the department (an Employee Physician in such capacity, a "Director").  Such duties and terms are enumerated in Medical Director Agreements (the "Medical Director Agreements").  GCRMC currently directly employs approximately 20 full or part-time Employee Physicians, 6 of whom are Directors.

88.     GCRMC also enters into allied health professional agreements such as Certified Nurse Midwife Employment Agreements and Family Nurse Practitioner Employment Agreements (collectively, with the Physician Employment Agreements and the Medical Director Agreements, the "Employment Agreements"), whereby it employs Certified Nurse Midwives and Certified Nurse Practitioners (together, the "Employee Certified Nurses," collectively with the Employee Physicians, the "Employee Medical Providers") respectively, on a full-time basis to, among other things, deliver primary and specialty care to patients, supervise services to patients, train new certified nurse midwives and certified nurse practitioners, and assist with certain administrative tasks.  In return, GCRMC agrees to pay the Employee Certified Nurses a base salary plus incentive compensation, and additional individualized compensation or incentives, provide certain benefits to the Employee Certified Nurses, as well as provide the Employee Certified Nurses use of the Hospital and/or a Practice Site.  GCRMC currently

employs approximately 3 full-time Certified Nurse Midwives and 1 full-time Certified Nurse Practitioner.

### ii. Employee Medical Providers' Salaries and Other Compensation

### Salaries and Incentive Payments

89.     All Employee Medical Providers are "exempt-status employees," meaning they are exempt from overtime requirements and are paid on a non-hourly basis.  Rather than paying Employee Medical Providers on an hourly basis, Employee Medical Providers receive base salaries (each, a "<u>Salary</u>").  The Debtor pays the Employee Medical Providers bi-weekly in arrears, with a Saturday payroll close date and a Friday pay date.  On a bi-weekly basis, the Debtor's payroll averages approximately $1.34 million in the aggregate; approximately $205,000 of such amount is paid to Employee Medical Providers.

90.     To prevent the severe disruption to the Debtor's operations that would likely result from any interruption in payroll, a special payroll for the period ending August 13, 2011 (ordinarily scheduled for disbursement on August 19, 2011) was made on August 15, 2011. Since the Employee Medical Providers have only been paid for their services through August 13, 2011, the Debtor estimates that approximately $43,000 has accrued but is not yet due to its Employee Medical Providers until the next pay date, with no single Employee Medical Provider having accrued compensation sought to be paid pursuant to this Motion in excess of $11,725.

91.     Additionally, Employee Medical Providers receive performance-based incentive compensation (the "<u>Incentive Compensation</u>"), as specifically provided for in each Employment Agreement.  Finally, as stated above, recruiting Medical Providers to Otero County can often be challenging, therefore to attract high-quality Medical Providers, Employee Medical Providers may be offered any of the following: signing bonus, commencement bonus, relocation

reimbursement, student loan assistance, temporary lodging (collectively, with the Incentive Compensation, the "Incentive Payments"),[10] under certain circumstances. The Incentive Payments are specifically provided for in each Employment Agreement. GCRMC estimates that the unpaid prepetition Incentive Payments owed to Employee Medical Providers total less than $24,000. The Debtor intends to continue to provide such benefits in the ordinary course post-petition.

### Vacation, Paid Time Off, and Sick Leave

92.     In addition to salaries and Incentive Payments, Employee Medical Providers accrue paid time off ("Paid Leave"), which varies based on length of service and employee type (full time and part time). The Employee Medical Providers also accrue sick leave at a fixed rate, regardless of length of service ("Paid Sick Leave," together with the Paid Leave, the "Paid Time Off"). Paid Time Off is accrued and may be redeemed pursuant to a written policy (the "Paid Time Off Policy").

93.     An Employee Medical Provider may cash out up to sixty hours of accrued Paid Leave annually ("Paid Leave Buyback"). If an Employee Medical Provider has accrued the maximum allowable amount of Paid Sick Leave, as a result of using less than such Employee Medical Provider's annual allotment of Paid Sick Leave, at the Employee Medical Provider's request the Debtor buys back the time above the maximum allowable amount at such Employee Medical Provider's ordinary rates once annually (the "Paid Sick Leave Buyback," and collectively with the Paid Leave Buyback, the "Ordinary Course Paid Time Off Buyback"). Upon the termination of its employment relationship with the Debtor, other than termination of

---

[10]     Only a single Medical Provider's combined earned but unpaid Salary and Incentive Payments exceed $11,725.

the Employee Medical Provider for cause, an Employee Medical Provider is paid its accrued but unused Paid Leave in a lump sum (the "Termination Paid Leave Buyback") and unused Paid Sick Leave ("Termination Sick Leave Buyback," and, collectively with the Termination Paid Leave Buyback, the "Termination Paid Time Off Buyback," and collectively with the Ordinary Course Paid Time Buyback, the "Paid Time Off Buyback").[11]  For the twelve-month period ending December 2010, the value of Paid Time Off cashed in by Employees and Employee Medical Providers pursuant to the various Paid Time Off Buyback programs was approximately $570,000.[12]

### iii.    Employee Medical Providers' Benefits

94.    In the ordinary course of its business, as is customary for companies of its size, the Debtor has established various employee benefit programs, available only to permanent employees, including the Employee Medical Providers, that include medical, dental, prescription drug, disability insurance, life insurance, 401(k) retirement benefits, educational assistance, discounts for services performed at the Hospital, and other similar benefits (collectively, the "Employee Medical Provider Benefits").  The Employee Medical Provider Benefits are generally described below.

### Medical, Dental, and Vision Insurance

95.    Medical, dental, vision, and similar insurance programs are central features of the Employee Medical Provider Benefits.  The Debtor maintains premium-based insurance programs

---

[11]    With respect to Paid Time Off accumulated as a result of accrued but unused sick leave, an Employee Medical Provider may only cash out half of such accrued but unused sick time as Termination Sick Leave Buyback, and then only in the maximum amount of 48 hours.

[12]    Total Paid Time Off Buyback in 2010 was comprised of the following amounts: $210, 379 Paid Leave Buyback; $114,764.66 Sick Leave Buyback; $198,639 Termination Paid Leave Buyback; and $52,016 Termination Sick Leave Buyback.

providing coverage as further described below. The Debtor is current on all payments under such programs.

96. The Debtor's employee medical insurance program, including prescription drug coverage, is administered by BlueCross BlueShield. The monthly cost of the medical insurance program to the Debtor for both Employees and Employee Medical Providers is approximately $399,000.

97. The Debtor's employee dental insurance plan is administered by Assurance at a monthly cost to the Debtor for both Employees and Employee Medical Providers of approximately $2,900. The Debtor's employee vision insurance plan is administered as part of the dental insurance plan at no additional cost to the Debtor.

98. In addition to their various health-related insurance benefits, the Employee Medical Providers are entitled to discounts on Hospital services in the event that they or an immediate family member requires Hospital care. All Employee Medical Providers, whether participating in the Debtor's medical insurance program or not, receive a discount on inpatient admissions and outpatient surgeries.

**Life and Disability Insurance**

99. The Debtor maintains certain premium-based life and disability insurance plans, as further described below. The Debtor is current on payments for all related premiums.

100. The Debtor provides all of its Employee Medical Providers with fully-funded life insurance administered by Anthem Life. Employee Medical Providers may opt to purchase additional coverage from Symetra Financial and have the premium deducted from their Salary. The monthly cost to the Debtor for its employee life insurance program is approximately $6,000 for both Employees and Employee Medical Providers.

101.     The Debtor also provides long-term disability coverage to its eligible Employee Medical Providers at no cost to them.  The long-term disability coverage is administered by Jefferson Pilot Financial, at an approximate monthly cost to the Debtor of $9,000 for both Employees and Employee Medical Providers.

## Workers' Compensation

102.     The Debtor maintains workers' compensation policies to cover injuries sustained by its employees during the policy year.  The annual premium for 2011 on such policies is approximately $444,000 ($37,000 monthly), which policies cover both Employees and Employee Medical Providers.  Besides the premium, the Debtor does not have other liability associated with the workers' compensation policies.

## Educational Assistance

103.     The Debtor reimburses Employee Medical Providers for all costs of Hospital-approved Continuing Medical Education ("CME") programs, including tuition, enrollment fees, and reasonable travel, food, and lodging costs, up to a certain amount per year pursuant to the Employment Agreements, providing such expenses have been pre-approved by certain Hospital management.  The Debtor also provides Employee Medical Providers with additional paid time off up to a certain amount depending on the Employee Agreement for CME.  On average, this fiscal year, the Debtor has spent less than $3,300 per month on CME reimbursement for Employee Medical Providers.  The Debtor is current on prepetition amounts owing for CME reimbursement.

## 401(k) Contributions

104.    The Debtor maintains a 401(k) plan for all eligible[13] Employee Medical Providers (the "401(k) Plan").  The Debtor contributes 5% of annual gross pay of eligible Employee Medical Providers (the "401(k) Contributions").  The Debtor pays an additional 5% of an Employee Medical Providers' gross annual pay that exceeds the cap for Social Security contributions.  In addition to the contributions made by the Debtor, Employee Medical Providers are permitted (but not required) to contribute an additional amount up to 95% of their total pay, up to the applicable federal limits.  Employee Medical Providers become vested in the 401(k) Plan at a rate of 20% per year upon the conclusion of their second year of eligibility such that they become fully vested upon the conclusion of their sixth year of eligibility.  The Debtor estimates that, as of the Petition Date, not more than $172,000 in 401(k) Contributions to Employee Medical Providers' accounts have accrued but have not yet been contributed to the 401(k) Plan.  Accruals to the 401(k) Plan date back no further than January 1, 2011.

## Social Security

105.    Social Security is an important part of every Employee Medical Provider's retirement benefits.  The Debtor makes a matching contribution to each of its Employee Medical Providers' Social Security taxes and Medicare taxes (collectively, the "SS Matching Obligations," and, together with the 401(k) Contributions, the "Retirement Obligations").  In the twelve months preceding the Petition Date, the Debtor spent an average of approximately $200,000 per month for both Employees and Employee Medical Providers in SS Matching Obligations.

---

[13]    Medical Providers that work more than 1,000 hours per year for two years are eligible to participate in the 401(k) Plan.

## Unemployment Compensation

106.     Each year, the Debtor contributes to the New Mexico Unemployment Insurance Compensation and Trust Funds on behalf of its Medical Providers (the "Unemployment Obligations"). The Debtor's total contribution for the second quarter of 2011 ending June 30, 2011 is approximately $3,300 for both Employees and Employee Medical Providers. As of the Petition Date, no Unemployment Obligations have accrued but have not yet been paid.

107.     The Debtor submits that it is essential for the morale and maintenance of trust of the Employee Medical Providers that necessary steps are taken to protect the Employee Medical Providers' retirement and unemployment benefits.

## Employee Medical Providers Reimbursements

108.     In the ordinary course of business, the Debtor reimburses its Employee Medical Providers for cash outlays they may from time to time be required to make on behalf of the Debtor (each such act of reimbursement, an "Employee Medical Provider Reimbursement"). At any given time, an Employee Medical Provider may be holding a reimbursable receipt for a business expense, and the Debtor has no way of knowing which of its Employee Medical Providers may have been obligated to make a purchase on behalf of the Debtor that has not yet been reimbursed. It is likely that such is the case as of the Petition Date.

## Miscellaneous Withholdings from Employee Medical Providers' Pay

109.     The Debtor deducts certain amounts from its Employee Medical Providers' pay for the payment of the Medical Provider's portion of medical and other welfare insurance premiums, flexible spending account plans that provide for withholdings on a pre-tax basis of certain medical and related expenses, 401(k) Plan deductions, and other miscellaneous amounts (collectively, the "Voluntary Deductions"). The Voluntary Deductions comprise property of the

Employee Medical Providers and are forwarded by the Debtor to appropriate third-party recipients at appropriate times.

110. The Debtor is also in possession of various withholdings, such as payroll taxes, social security, unemployment, garnishments, child support payments, etc. (together with the Voluntary Deductions, the "Deductions"). It is likely that funds have been deducted from Employee Medical Providers' wages but have not yet been forwarded to the appropriate third-party recipients. Without authority to forward the Deductions to the appropriate parties, the Debtor may expose its officers and directors to personal liability, which would create an unnecessary and undue distraction to such individuals at a critical juncture in the Debtor's operations and restructuring efforts.

#### iv. Non-Employee Medical Providers

111. Occasionally, GCRMC enters into agreements with Medical Providers for a limited purpose or for a limited amount of time. In such cases, it is not necessary to directly employ such Medical Providers; therefore GCRMC does not enter into an Employment Agreement with such Medical Provider. Rather, GCRMC may enter into an Income Guarantee, an On-Call Agreement, or other independent contractor agreement (collectively, the "Non-Employee Medical Provider Agreements") all defined and generally described below. Any Medical Provider who is a party to a Non-Employee Medical Provider Agreement, and not an Employment Agreement, is not entitled to any of the Employee Medical Provider Benefits. Such Medical Providers, however, may be entitled to other benefits as specifically enumerated in their Non-Employee Medical Provider Agreements.

#### The Income Guarantees

112.     In addition to hiring full-time Employee Medical Providers at the Hospital and the Practice Sites, GCRMC also recruits talented Medical Providers by entering into Hospital and Physician Agreements, whereby the Hospital subsidizes the Medical Providers' net practice income for a certain amount of time while the Medical Provider establishes their practice in the area (the "Income Guarantees").  Medical Providers who are parties to the Income Guarantees are not employees of GCRMC, but are rather independent contractors who have offices in the local community and practice privileges at the Hospital.  The Income Guarantees promise that GCRMC will subsidize the income of the Medical Provider, subject to certain conditions, by paying the deficit between net practice income and a certain agreed-upon amount for a limited period of time.  Additionally, pursuant to the Income Guarantees, GCRMC promises the Medical Provider certain pecuniary benefits including, but not limited to, payment of relocation costs, certain bonuses, student loan repayment, and lines of credit to subsidize the costs of setting up a new medical practice in the community.  In return, the Medical Provider agrees to engage in a full-time medical practice for a specified period of time and maintain reasonable office hours.

### The On-Call Agreements

113.     To maintain the effectiveness of its emergency room and its designation as a Level III trauma center, the Hospital requires 24-hours-a-day on-call coverage.  Accordingly, GCRMC enters into Additional On-Call Agreements and Trauma Call Agreements (collectively, the "On-Call Agreements"), whereby Medical Providers agree to be available to respond to calls for service from the Hospital's emergency department on certain days pursuant to the Hospital's monthly on-call rotation schedule.  In return, GCRMC agrees to compensate the Medical Providers with a daily or monthly fee depending on the agreement.

### Other Independent Contractor Agreements

114.     From time to time, GCRMC enters into independent contractor agreements with Medical Providers who provide specific necessary services for a limited amount of time. Medical Providers employed under such agreements are not directly employed by GCRMC but are necessary to meet the healthcare needs of the community.

v.    **Additional Facts**

115.     The Medical Providers are the "lifeblood" of the Hospital and are directly and indirectly charged with patient care and safety.  Without the Medical Providers, the Hospital, the Practice Sites, and other local medical service providers relying on GCRMC to recruit and compensate Medical Providers would be unable to care for their patients – the very purpose of a healthcare facility.  Further, the loss of even a single Medical Provider could have devastating effects on the Debtor's ability to provide comprehensive care and replacing a Medical Provider is a difficult and expensive process.  Accordingly, GCRMC's relations with the Medical Providers are paramount to the continued operation of the Hospital, the Practice Sites, and the other healthcare providers in and around Otero County.  There is no question that the Medical Providers and the Medical Provider Agreements are vital components of a successful reorganization and are critical to maintaining the high quality of care currently provided by the Debtor to the community.

116.     Finally, making the prepetition payments due under the Medical Provider Agreements in accordance with the Debtor's discretion and in the ordinary course of business is in the best interest of the Debtor, its estate, its creditors, and all parties in interest.  Such payments to the Medical Providers will enable the Debtor to continue to provide necessary medical care to its patients as well as efficiently operate the Hospital and Practice Sites

throughout the Bankruptcy Case. The amount of such payments pale in comparison to the costs associated with the loss of Medical Providers to the community.

117. The failure to pay any Medical Provider obligations could result in the Medical Providers' refusal to perform, among other things, which would pose an unacceptable risk to the Debtor's reorganization at a time when the Debtor requires consistent, if not heightened, contributions at all levels of its operations. Without the Medical Providers, the Debtor would suffer immediate and irreparable harm.

118. The failure to honor the Paid Time Off Buyback programs, pursuant to the Paid Time Off Policies, will be severely damaging to the Debtor's relations with its Employee Medical Providers. Employee Medical Providers with a surplus of accrued Paid Time Off have foregone vacations in the past in order to help the Debtor meet the demands of operating the Hospital. During the pendency of this Bankruptcy Case, these same Employee Medical Providers will be asked to continue those efforts, and, in many cases, do more. It would be inequitable to demand more of these Employee Medical Providers while simultaneously depriving them of earned benefits. Moreover, this appearance of inequity would be highly destructive to the goodwill the Debtor has developed with its Employee Medical Providers, and may cause those Employee Medical Providers to refuse to perform or to look elsewhere for work. As stated above, even the loss of a single Employee Medical Provider would have dire consequences for medical care in the community.

**E.**    **Debtor's Motion for an Interim and Final Order (i) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service to the Debtor; (ii) Deeming Utility Companies Adequately Assured Of Future Payment; and (iii) Establishing Procedures for Determining Requests for Additional Adequate Assurance (the "Utility Motion")**

119. In connection with the operation of its businesses and management of its properties, the Debtor procures electricity, water, gas, and similar services (together, the "Utility Services") from different utility companies (the "Utility Companies"). A list identifying all or substantially all of the Utility Companies providing services to the Debtor is attached to the Utility Motion as Exhibit A.

120. Historically, the Debtor has paid all amounts owing to the Utility Companies on a timely basis. To the best of my knowledge, the Debtor is current with respect to all of its undisputed invoices for Utility Services provided by the Utility Companies, except where the commencement of the Bankruptcy Case may have interrupted some of these payments. In the twelve months preceding the Petition Date, the average aggregate monthly cost of Utility Services provided by the Utility Companies was approximately $104,840.

121. If the Utility Companies are permitted to terminate Utility Services, the Debtor's operations will be irreparably harmed and its ability to reorganize jeopardized.

**F. Debtor's Motion for Entry of an Order (i) Authorizing Debtor to (a) Maintain Insurance Programs, (b) Maintain Insurance Premium Financing Programs, (c) Pay Insurance Premiums in the Ordinary Course and (d) Pay all Obligations Associated Therewith; and (ii) Preventing Insurance Companies From Giving Any Notice of Termination or Otherwise Modifying any Insurance Policy Without Obtaining Relief from the Automatic Stay (the "Insurance Motion")**

122. In the ordinary course of business, the Debtor maintains a corporate risk program pursuant to which the Debtor procures numerous insurance policies (each, as may be revised, extended, supplemented, renewed, or changed, an "Insurance Policy," and collectively, the "Insurance Policies"). The Debtor maintains the Insurance Policies in amounts and types of coverage in accordance with applicable law, as is necessary and prudent, and pursuant to contractual obligations. The Insurance Policies provide coverage for, among other things,

general liability, worker's compensation, employer's liability, hospital professional liability,
directors' and officers' liability, and property losses.

123.    The annual premiums under the Debtor's 2011 Insurance Policies total
approximately $8,004,381.  The current carriers of the Insurance Policies (as may be revised,
extended, supplemented, renewed, or changed, the "Insurance Carriers") are set forth in
Exhibit A, attached to the Insurance Motion, along with the corresponding type of coverage and
individual annual premiums.  No prepetition amounts are owing in respect of any of the
Insurance Policies.

    **i.    Policies with Financed Premiums**

124.    The Debtor's hospital professional, general liability, umbrella, and excess
insurance premiums (the "Darwin Premiums") were financed pursuant to a premium finance
agreement (the "Premium Finance Agreement") between the Debtor, as insured, and Western
Commerce Bank ("WCB"), as lender.  Under the Premium Finance Agreement, the Debtor paid
an initial down-payment and monthly installments thereafter to WCB in exchange for WCB's
agreement to pay the full annual insurance premium, in advance, to the Debtor's insurers (the
"Premium Finance Program").  The total annual premiums under the Insurance Policies covered
by the Premium Finance Agreement for the 2011 policy period were $1,991,314.77.  The down-
payment under the Premium Finance Agreement was $497,828.70 and, after assessment of a
$25,789.43 finance charge, the Debtor financed a total of $1,519,275.50.  The financed amount
was payable in 10 monthly installments of $151,927.55, due on the ninth day of each month.  As
of the Petition Date, the Debtor is current on its obligations to WCB under the Premium Finance
Agreement.

125.     The Debtor's obligations under the Premium Finance Agreement are secured by all unearned premiums or dividends payable to the Debtor under the Insurance Policies covered by the Premium Finance Agreement, as well as any loss payments.  Under the Premium Finance Agreement, WCB is appointed the Debtor's attorney-in-fact with authority to, among other things, cancel the Insurance Policies in the event of non-payment.

### ii.     Policies without Financed Premiums

126.     The Debtor does not finance any premiums under its Insurance Policies other than the Darwin Premiums.  Premiums payable under the Insurance Policies that are not financed are paid in accordance with the applicable agreement governing each such Insurance Policy.  As of the Petition Date, the Debtor believes that is has no prepetition obligations owing on account of any of is Insurance Policies without financed premiums.

127.     The Debtor expended considerable time and effort to secure its Insurance Policies, particularly those financed pursuant to the Premium Finance Agreement.  Such effort was necessary because law and general prudence require that the Debtor maintains, among other things, professional and general liability coverage in its operation of the Hospital.  If any of the Insurance Policies were terminated, the Debtor would be forced to expend considerable effort in securing replacement Insurance Policies, distracting from its responsibilities to operate its business as a debtor in possession and to successfully reorganize.

### G.     Debtor's Motion for Entry of an Order Authorizing (i) Payment of Certain Ordinary Course Patient Overpayments; and (ii) Turnover of Certain Third-Party Payor Funds (the "Patient and Third Party Funds Motion")

128.     The Patient and Third Party Funds Motion concerns the proper application of funds held by the Debtor relating to services rendered to patients of the Hospital (the "Patients"),

including overpayments made by patients, overpayments made on behalf of Patients, and payments collected by the Debtor on behalf of third parties to whom such payments are owed.

**i.**         **Reimbursements of Patient Overpayments**

129.     The Debtor seeks authorization to refund undisputed overpayments and/or deposits paid by Patients (the "Patient Refunds") and by their insurers (the "Insurer Refunds," and, collectively with the Patient Refunds, the "Refunds") regardless of whether those claims to such overpayments arose prepetition or postpetition.

130.     The need to pay a Refund on account of an overpayment may occur under a variety of circumstances.  Patient Refunds are called for when a patient pays upon receipt of services and the Debtor is later reimbursed by such patient's insurance provider (each, an "Insurer"), patients overpay deductibles or copayments, or a patient receives financial assistance for services but has already paid for a portion of the services received.  Likewise, an Insurer may overpay for a service provided to an insured Patient and thereby become entitled to a Refund. The Debtor does not believe it is appropriate to keep overpayments made by or on behalf of Patients who have utilized the Hospital's services, and that the failure of the Debtor to refund such overpayments would be deleterious to its reputation in the community and its relationships with existing Patients and Insurers.

131.     Patients and Insurers are crucial to the ongoing vitality of the Hospital.  Failure to refund undisputed overpayments, would likely result in severe and irreparable harm to the positive patient relations that the Debtor has invested heavily to develop and maintain.

132.     In the twelve months ended December 31, 2010, the Debtor returned Refunds in a total amount of approximately $975,241.  This amount was comprised of $63,416 in Patient

Refunds and $911,824 in Insurer Refunds.  The Debtor estimates that it owes, and seeks authority (but not the direction) to pay, not more than $500,000 in Refunds.

### ii.    Third-Party Trust Funds

133.    In the ordinary course of its business, the Debtor invoices and receives payments on behalf of third-party services providers (the "Third Party Providers"), such as physicians, that provide services at the hospital.  Such payments are made for services relating to care provided by the Third Party Providers at the Hospital.  In the typical situation, the Debtor invoices for services it provides, such as bed charges and charges for consumables provided to a Patient, and, for the convenience of Patients, Insurers, and Third Party Providers, also invoices for the Third Party Provider's services.  Once funds have cleared, the Debtor forwards the fee earned by the Third Party Provider to such Third Party Provider.

134.    It is of vital importance to the preservation of value of the Debtor's services that it be authorized, in its sole discretion and upon its sound business judgment, to turn over funds due and owing to Third Party Providers, regardless of whether the underlying services were provided by the Third Party Provider prepetition or postpetition.

135.    It would be destructive to the Debtor's business and relationships with the Third Party Providers to withhold payments received after the Petition Date from third-party payors which, in the ordinary course of business, and consistent with the practices of the parties, would be paid to the Third Party Providers.  Any interruption to the Debtor's ability to provide payments from third-party payors to the Third Party Providers would likely cause such Third Party Providers to avoid or cease using the Hospital to perform their services.  These concerns would result in an adverse impact on patient care.  Indeed, the Third Party Providers' importance to the Hospital and patient care is self-evident.  Any possible disruption to the care of the

Patients resulting from the Debtor's inability to forward funds paid by third parties to their intended Third Party Provider recipients would be devastating to the Debtor's reputation within the community.

**H.    Debtor's Motion for Authority to Make Postpetition Payments on Account of Prepetition Claims of Medicare and Medicaid and Permit Deductions for Overpayments in the Ordinary Course of Business (the "<u>Medicare/Medicaid Motion</u>")**

136.    Because of certain salient demographic characteristics of the patient population served by the Hospital, the Debtor relies heavily upon reimbursements for patient services from various governmental agencies made pursuant to the Medicare and Medicaid programs for medically necessary services based on estimates of costs.  Indeed, in the most recent fiscal year, 62.3% of the Debtor's patient revenues were derived from Medicare and Medicaid reimbursements, with 46.5% coming from Medicare and 15.8% coming from Medicaid.

137.    In the ordinary course of its business, the Hospital files paperwork with the governmental intermediaries (the "<u>Governmental Intermediaries</u>") established to manage Medicare and Medicaid reimbursements on behalf of the Centers of Medicare and Medicaid Services ("<u>CMS</u>") to obtain reimbursements for services provided to patients.  Upon review thereof, if reimbursement is deemed warranted, the applicable Governmental Intermediary advances the requisite funds to the Hospital.

138.    From time to time, after reimbursing the Hospital for a particular service, the applicable Governmental Intermediary performs an audit to determine whether the amount requested and advanced to the Hospital accurately reflects the reimbursable value of the Hospital's services.  Due to the extraordinary volume of Medicare and Medicaid reimbursement requests submitted to the Governmental Intermediaries by the Hospital, such audits may not take place for months or even years.  To the extent that a Governmental Intermediary ultimately

determines that the Hospital was overpaid, the Governmental Intermediary may reduce future reimbursements paid to the Hospital by the amount of past overpayments or demand that the Hospital pay back the amounts of the overpayments.

139.    During the course of this case, the Debtor will likely face demands from the Governmental Intermediaries for the reimbursement of past overpayments.  Moreover, future reimbursements made to the Debtor may become subject to reduction in the amount of past overpayments.  If the Debtor fails to agree to deductions of overpayments from future reimbursements, the Debtor may be excluded from future participation in the Medicare and Medicaid programs, which exclusion would cripple the Debtor's ability to keep its doors open. As noted previously, over 62% of the Debtor's revenues are derived from Medicare and Medicaid.

**I.     Debtor's Motion for Authority to Pay Prepetition Trust Fund Taxes in the Ordinary Course of Business (the "Trust Fund Tax Motion")**

140.    In the ordinary course of business, the Debtor collects sales taxes or similar trust fund-type taxes (however denominated, the "Trust Fund Taxes") from certain of its customers and subsequently remits such taxes to the appropriate taxing authority (the "Taxing Authority"). Specifically, by virtue of its business operations, the Debtor is required to charge sales tax in its operation of the Hospital's cafeteria and maternity store and remit such taxes to the state of New Mexico.

141.    A schedule of estimated Trust Fund Taxes owing to the Taxing Authority as of the Petition Date is attached to the Trust Fund Motion as Exhibit A.

142.    There is often a lag-time between the time when the Debtor incurs an obligation to pay the Trust Fund Taxes and the date when payment of such taxes is due.  Various Taxing Authorities may therefore have claims against the Debtor for Trust Fund Taxes that have

accrued, but are unpaid and not yet due, as of the Petition Date. The relevant Taxing Authority may also make retrospective adjustments to determine any payment deficiency or surplus for a particular period resulting in a demand for further payment from or refund to the taxpayer. The estimated aggregate amount of prepetition Trust Fund Taxes owing to the various Taxing Authorities as of the petition date should not exceed $10,000.

**J.     Motion for Order Granting Authority to File Separate Creditor Matrix and Schedule F Containing Patient Information Under Seal (the "Seal Motion")**

143.     In providing first-rate medical care, GCRMC becomes privy to personal, intimate, and sensitive information about its patients. GCRMC acknowledges, as a healthcare provider, that the importance of protecting such information is paramount in providing high-quality health care. For this reason, GCRMC does not want to disclose any information that would publicly identify its patients during this Bankruptcy Case, including patients' names and addresses. Simultaneously, GCRMC seeks to give sufficient notice of these proceedings to all creditors, including patients. Accordingly, a balance must be struck between protecting its patients' privacy rights and providing adequate notice in compliance with due process.

144.     Importantly, GCRMC seeks to be overprotective of its patients' privacy rights, as opposed to under-protective, because a patient care ombudsman has not yet been appointed. Moreover, if GCRMC were required to disclose its patients' private information it would likely constitute a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as well as a violation of its patients' trust. Violating either could have a detrimental effect on GCRMC's operations and reorganization efforts.

145.     GCRMC takes great precautions when dealing with its patients' medical information to protect patient privacy and foster patient trust. In addition to its business and ethical interests in protecting its patients' privacy, GCRMC is prohibited from disclosing

patients' names and addresses or other records relating to payment for medical services under applicable HIPAA regulations.

**K.    Debtor's Application for Order Authorizing and Approving the Appointment of Kurtzman Carson Consultants LLC as Noticing, Claims and Balloting Agent**

146.    The Debtor seeks to retain Kurtzman Carson Consultants LLC ("KCC") as its noticing, claims and balloting agent as of the commencement of this case (the "Noticing, Claims and Balloting Agent").  The Debtor has selected KCC as its Noticing, Claims and Balloting Agent because of its substantial experience and the reasonableness of its fees.

147.    The Debtor estimates that there are well in excess of 100,000 potential creditors in this chapter 11 case.  In addition, the Debtor believes that there are many additional parties in interest who should receive notice of various matters in this case.

148.    The terms of KCC's retention are reasonable and appropriate for services of this nature and comparable to those charged by other providers of similar services.  After much consideration, the Debtor has concluded that KCC is the best choice for Noticing, Claims and Balloting Agent in this case.  The Debtor believes that the Services Agreement contemplates compensation at a level that is reasonable and appropriate for services of this nature.

**L.    Debtor's Motion For Entry Of An Order (I) Authorizing The Assumption Of Lease Agreement By And Between The City And The Debtor Pursuant To Section 365 Of The Bankruptcy Code And Bankruptcy Rule 6006 And (II) Establishing Cure Amount (the "Lease Assumption Motion")**

149.    In order to fund the payments due in respect of the Bonds, as defined above, on or about November 1, 2007, the City of Alamogordo and GCRMC entered into the Lease Agreement,[14] as described above.  The payments pursuant to the Lease Agreement are in such amounts as are necessary to provide funds to the City to pay the principal and purchase or

---

[14]    A true and correct copy of the Lease Agreement is attached to the Lease Assumption Motion as Exhibit A.

redemption price and interest on the Bonds when due. Payments pursuant to the Lease Agreement are favorable to GCRMC in light of the value of the assets leased. Moreover, without the Lease Agreement, GCRMC would not have access to the very Facilities through which it provides the community with first-class health care. GCRMC simply has no alternative to the Lease Agreement to obtain facilities to carry out its mission. Accordingly, GCRMC seeks to assume the Lease Agreement.

**M.** **Debtor's Motion to Establish and Implement Exclusive and Global Procedures for Submitting and Resolving Claims Related to Goods Received within Twenty Days Prior to the Petition Date for Treatment Pursuant to Section 503(b)(9) of the Bankruptcy Code**

150. In the ordinary course of its business, the Debtor relies upon various third-party vendors for the provision of essential goods and services. The Debtor's relationships with such third-party vendors (the "Vendors") permit the Debtor to function on a day-to-day basis and facilitate the Debtor's provision of essential services to the community. Any disruption to its relationships with the Vendors would be disruptive to the Debtor's overall business, and, in some cases, devastating.

151. The Vendors delivering goods to the Debtor that were received by the Debtor within the twenty days preceding the Petition Date are referred to as the "503(b)(9) Vendors." As of the Petition Date, the Debtor estimates that the aggregate value of all potential 503(b)(9) Claims is between $600,000 and $1.5 million.

**N.** **Debtor's Motion for Authority to Make Postpetition Payments on Account of Prepetition Claims of Alamogordo Surgery Ventures, LLC in the Ordinary Course**

152. In 2006, the Debtor and certain physicians (the "Physician Members") established Alamogordo Surgery Ventures, LLC ("ASV") pursuant to the terms of an operating agreement dated November 17, 2006 (the "Operating Agreement"). ASV is a New Mexico limited liability

company established for the purpose of operating an outpatient surgery center located on the Hospital property (the "Surgery Center"). ASV provides outpatient surgical services to members of the greater Otero County community and invoices the patients and/or insurance provider for the costs of such procedures. The Debtor the pays ASV for such surgeries at a fixed per-procedure cost. The Surgery Center benefits the community by (1) promoting health and wellness; (2) making outpatient surgery services more accessible within the community; (3) providing a facility for the efficient provision of outpatient services; (4) improving the quality of care available to the residents of the community; and (5) expanding healthcare resources within the community. ASV benefits from a policy of the Centers for Medicare & Medicaid Services that, under certain circumstances, permits a joint venture controlled by a sole community healthcare provider to receive heightened Medicare and Medicaid reimbursement rates than would a non-affiliated equivalent facility.

153. Based on the months of May, June, and July of 2011, the Debtor's average monthly payment to ASV for the services it performs is approximately $650,000. ASV's billing cycle to the Hospital is monthly based on full calendar months. Accordingly, on the Petition Date, the Debtor had fifteen accrued but unpaid days worth of surgeries performed at ASV for which it is liable pursuant to the terms of its agreement with ASV (the "Prepetition ASV Obligations"). The Debtor estimates the total value of the Prepetition Obligations to be approximately $325,000.

154. In addition to using ASV's surgical services for the benefit of the community, the Debtor also holds a 40.5% equity stake in ASV, a 51% voting interest, and is the landlord under ASV's lease for the Surgery Center (the "Lease") dated November 17, 2006. As an equity member, the Debtor is periodically entitled to distributions from ASV (the "Equity

Distributions"). Such distributions are made monthly and typically amount to approximately $80,000 per month. As ASV's landlord, the Debtor is entitled to monthly lease payments for base rent and additional rent for *pro rata* utilities and other miscellaneous items. The monthly base rent paid by ASV to the Debtor for the use of the Surgery Center is approximately $38,000 per month.

155.    The 59.5% of ASV's equity interests *not* held by the Debtor are held predominantly by Physician Members that also perform surgical procedures at the Surgery Center. The Debtor believes that the Physician Members may elect to perform fewer procedures at the Surgery Center if the Debtor fails to perform all of its obligations to ASV in the ordinary course, and possibly consider options to create a new surgery group elsewhere. The Debtor further believes that its substantial goodwill with the Physician members would be irreparably harmed if it failed to perform all of its obligations to ASV in the ordinary course.

156.    Failure to honor the Debtor's Prepetition ASV Obligations in the ordinary course would cause irreparable harm to its relationship and goodwill with the Physician Members. More than mere appeasement of the Physician Members, the Debtor submits that its failure to honor the Prepetition ASV Obligations in the ordinary course may affect the Physician Members' willingness to continue performing surgeries at the Surgery Center, which would be damaging not only to the Debtor but also to the community as a whole. The Surgery Center is the sole resource of its type within the community and any disruption to its operations would have a deleterious effect on community health and patient care. To allow this to occur would be inconsistent with the Debtor's duties to the community and the Debtor therefore seeks to minimize the effect of its bankruptcy filing on ASV and the Surgery Center.

## **Conclusion**

157.     The Debtor hopes to confirm a plan of reorganization and emerge from Chapter 11 in as short a time as is necessary.  The Debtor believes that the protections afforded by chapter 11 will enable it to develop, implement and consummate a restructuring that will provide for the equitable treatment of all claims and interests.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 16, 2011 in Albuquerque, New Mexico.


_____

William Morgan Hay